ROBERT C. DUFF, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37552. Promulgated August 28, 1931.

*Robert C. Duff, Esq.,* pro se.
*Harold Allen, Esq.,* for the respondent.

OPINION.

Love: In regard to the first issue, respondent contends that petitioner is claiming a loss in 1923 on securities all of which he still owns, and that the alleged loss is not deductible in that year for the reason that no such loss is deductible until it is established by sale or other disposition of the securities; and also that since there was no capital outlay for the guaranty of the bonds of the Beaumont & Great Northern Railroad Company, the total amount received for the release of the guaranty, viz., $28,393.67, was received as taxable income. In regard to the second issue concerning the deduction on petitioner's 1925 return of the net loss of $12,417.83 shown on his return for 1924, respondent contends that the loss in 1924 was not sustained in the course of a business regularly carried on by petitioner; and, also, that no capital gains having been reported or found on the 1924 return, it follows, under the provision of the statute, that the net loss appearing on that return is not an allowable deduction in 1925.

Discussing the issues in their order, we are of the opinion that petitioner has fully and clearly sustained his allegations of loss on his $45,000 par value of first mortgage 5 per cent gold bonds of the Beaumont & Great Northern Railroad Company. We do not understand respondent's contentions that petitioner is claiming a loss " on securities all of which he still owns," and that " to overcome the fact that no loss has been established by sale or other disposition of the bonds, petitioner argues their worthlessness at the time of their receipt," which contention, says the respondent, " is not sustained by the evidence in the record." It certainly is *not* sustained, nor does petitioner argue or contend for any such thing. On the contrary, petitioner strenuously asserts, and it is not denied, that he received these bonds in 1912 as compensation for legal and other services; that the bonds so received were guaranteed as to principal and interest by the Missouri, Kansas & Texas Railroad Company, which guar-

anty was not rescinded until 1923; and that the bonds so guaranteed were worth their par value of $45,000 at the time of their receipt and at March 1, 1913; and we have so found. Furthermore, petitioner does not "still own" all of these securities, nor any of them. The evidence in the record is clear that under the Beaumont agreement and the settlement agreement, the entire issue of $883,000 of these bonds (of which petitioner's $45,000 was a part) was delivered to the reorganization managers who erased the guaranty of the railroad company and returned them to petitioner, who forthwith brought about their cancellation and retirement, and the satisfaction of the first mortgage lien underlying the issue. We do not know whether or not petitioner retained what had once been "the bonds"—the evidences of the debt when that debt existed, though we doubt it; but if he did, such "evidences" then had no more value than any other worthless pieces of paper. Petitioner and respondent agree that in the settlement petitioner received as his share thereof, in cash and securities of the West Lumber Company and the reorganized Missouri, Kansas & Texas Railroad Company, his 45/883 of their fair market value at the time of consummation in 1923, which was $28,393.67.

We find it difficult to follow the thread of respondent's argument in regard to this issue.

Section 202 of the Revenue Act of 1921, which is applicable here, provides that the basis for ascertaining the gain derived or the loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired before March 1, 1913, shall be the cost of such property, with certain limitations which are here immaterial, which in this case we have found to be the same as its March 1, 1913, value, viz., $45,000.

Respondent and petitioner agree that the fair market value of petitioner's pro rata of the securities received from the reorganization managers under the Beaumont agreement and the settlement agreement was $28,393.67. It is clear then that petitioner's loss on that closed transaction was $16,606.33.

It is true that petitioner about that time took over from the reorganization managers the entire capital stock of the Beaumont and Great Northern, amounting in face value to $50,000, and thus acquired absolute control of that property; and that he also took over another small railroad property running from Trinity to Colmesneil, for the acquisition of which he borrowed $100,000 from the reorganization managers on his personal five-year note; and respondent alleges further that petitioner immediately paid out $75,000 for new equipment (which we do not find sustained by the record); that he was "congratulated" on the settlement obtained; that he had succeeded in getting the property at no cost to himself;

that it was "an excellent settlement" in the opinion of Carlisle's attorney; and that petitioner was "personally anxious" to obtain these properties and operate them.

But we do not see what these contentions have to do with the issue before us. It was only at the insistence of the reorganization managers, as a condition precedent to any further negotiations in connection with the bonds, that petitioner finally consented to take over the Beaumont Company's property. In so doing he was certainly getting nothing of value at that time, but rather he was assuming a known liability. That was the opinion also of the reorganization managers, whose counsel, when petitioner expressed doubt as to the wisdom of his course, replied that they were far more anxious to get rid of the property than petitioner was to take it. The "congratulations" to which respondent refers were addressed, as a matter of fact, not to petitioner, but to Haid, Carlisle's attorney, and even so, though Carlisle fared better than petitioner, since no part of the burden of the Beaumont property was assumed by him, it seems to us that they were not free from a suspicion of irony, for in response to Haid's remark that another lamb had been shorn in Wall Street, one of the attorneys for the reorganization managers replied: "Haid, you have gotten a great deal more than I think you are entitled to and I congratulate you." In other words, something had been saved from the wreck. But the taking over by petitioner of the Beaumont property and the later acquisition by him of the Sabine property was a separate transaction from the cancellation and retirement of the Beaumont bonds in consideration of the receipt of certain bonds of the West Lumber Company, and preferred and common stock of the reorganized Missouri, Kansas & Texas Railroad Company, which is the issue that we have immediately before us.

The Beaumont and the settlement agreements were executed January 23, 1922, but it was not until two months later that petitioner executed the Sabine agreement, under which he acquired the line of railroad from Trinity to Colmesneil, as his only hope of making the Beaumont property pay in the future, by amalgamating the two and extending them to Waco, on the west, from Weldon; and southeasterly from Livingston through Beaumont to Port Arthur, connecting with the M. K. & T. at Waco for an interchange of traffic, and tapping the great oil-refining district at and south of Beaumont. And it was not until a year later, January 8, 1923, that the supplemental agreement was entered into which made even remotely possible the translation of petitioner's dreams and visions into partial reality. It is the securities of these amalgamated properties, known as the Beaumont, Trinity & Sabine Railway Company, that petitioner still owns"; and since neither a gain nor a loss in con-

nection with them is asserted in petitioner's returns for 1923 or 1925, which are the years before us, we are not concerned with them here. Respondent cites us to nothing in support of his contentions and argument, and the facts are so clear, it seems to us, that no citations by us are necessary beyond a statement of the provisions of the law in the case.

In regard to the second issue, we do not believe that it could be contended with success before any tribunal that a man actively and regularly engaged in a business of considerable magnitude for a period of years ceases to be "regularly" engaged in that business during a necessary and reasonable period of liquidation, even though the major portion of his thought, energies, and time, during such period of liquidation, is devoted to a new venture. In *Oscar K. Eysenbach*, 10 B. T. A. 716, we said:

> It is to be noted that in order to constitute a "net loss," it is not necessary that taxpayer should sustain the loss in his principal business or vocation. The word "business" [in section 204 of the Revenue Act of 1921] is qualified by the word "any." The taxpayer is entitled to this benefit where the loss is incurred in "any trade or business regularly carried on" by him.

Respondent does not deny that in 1924 a loss of $25,596.15 on sales of real estate produced a net loss on petitioner's return for that year of $12,417.83 which petitioner seeks to carry forward to 1925; but he contends that "this issue is quickly disposed of by reference to section 206 (a) (2) of the Revenue Act of 1924."

The applicable provisions of that act are as follows:

> SEC. 206. (b) If, for any taxable year, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be allowed as a deduction in computing the net income of the taxpayer for the succeeding taxable year * * *.

> SEC. 206. (a) As used in this section the term "net loss" means the excess of the deductions allowed by section 214 or 234 over the gross income, with the following exceptions and limitations:

> *   *   *   *   *   *   *

> (2) In the case of a taxpayer other than a corporation, deductions for capital losses otherwise allowed by law shall be allowed only to the extent of the capital gains.

> SEC. 208. (a) For the purposes of this title—
> (1) The term "capital gain" means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921;
> (2) The term "capital loss" means deductible loss resulting from the sale or exchange of capital assets;

> *   *   *   *   *   *   *

> (8) The term "capital assets" means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business.

If, then, the loss claimed by petitioner is a "capital loss," as contended by respondent, it may be allowed only to the extent of the capital gains, since the petitioning taxpayer here is not a corporation.

A copy of petitioner's return for the calendar year 1924 was admitted in evidence. It does not show any capital gains, nor were any proven at the hearing. But Schedule C of that return shows that the loss from sale of real estate was derived as below:

| Kind of property | Date acquired | Amount received | Cost | Loss |
|---|---|---|---|---|
| House property | 1923 | $52,500.00 | $54,892.72 | $2,392.72 |
| I. and G. N. Survey | 1919 | 29,801.30 | 53,004.73 | 23,203.43 |
| | | | | 25,596.15 |

From this it appears that the "house property," having been acquired in 1923 and sold or exchanged in 1924, had not been held by the taxpayer for more than two years, and so does not constitute a capital asset, from the sale or exchange of which alone can a capital loss be sustained. No deficiency has been asserted by the Commissioner for 1924, and the taxes for that year are not under review by us; but the loss in 1924 of $2,392.72 on the "house property" was not a "capital loss" that could be offset only against "capital gains," as provided in section 206 (a) (2) of the Revenue Act of 1924. It was a loss sustained in the course of a business regularly carried on by the taxpayer; the amount of the loss to be determined as provided in section 202 of that act, and the *net loss*, if any, resulting from such sale or other disposition of the property may properly be deducted on petitioner's return for 1925.

The loss sustained on sale of the I. & G. N. survey, having been held for more than two years, was a capital loss, and may not be carried forward to 1925 in the absence of capital gain for 1924.

Petitioner's taxes for 1923 and 1925 will be recomputed in accordance with our findings and this opinion.

*Judgment will be entered under Rule 50.*