JOHN P. WHITE AND AGNES S. WHITE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4281-65.    Filed June 26, 1967.

John P. White, pro se.
*Frank T. Wrenick*, for the respondent.

HOYT, *Judge:* Respondent disallowed a claimed loss deduction of $1,200 and assessed against petitioners an income tax deficiency for the taxable year 1963 in the amount of $276. The sole question for our decision is whether the loss by petitioners of a diamond from petitioner Agnes' engagement ring is a casualty loss allowable under section 165 (c) (3), I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and such facts together with the stipulated exhibits are incorporated herein by this reference and adopted as our findings.

Petitioners are John P. and Agnes S. White, husband and wife, who maintained their legal residence in Gates Mills, Ohio, both at the time of filing their petition herein and at trial. For the taxable year 1963, they filed their joint Federal income tax return with the district director of internal revenue in Cleveland, Ohio. John is a lawyer by profession and in 1963 he was employed in Cleveland by the Glidden Co.

In 1950 John purchased a diamond engagement ring in Chicago, Ill., for Agnes. The diamond was a 1.38-carat stone set as a solitaire in a simple four-pronged mounting. He paid $1,200 for the ring at the time of purchase.

The facts giving rise to the claimed casualty were described by petitioner John as "painfully simple." On a windy fall day in October of 1963, John was driving Agnes home from an afternoon of shopping. He drove into the crushed-gravel driveway of their Gates Mills, Ohio, residence and after getting out proceeded to the other side of the car, as was his custom, to assist his wife. John then opened the door at the right for Agnes while focusing his attention on one of their five young children. Agnes got out of the car from the passengers' side.

After Agnes had alighted, she reached into the car again with one hand to retrieve something left on the seat. At the same time, John, unaware of his wife's action, pushed the door closed forcefully to overcome a wind which was then blowing. Before the door closed completely, John realized that Agnes had inserted her hand through the open door and into the car. He reached for the door in an effort to stop its closing, but, unfortunately, missed, and the door slammed on Agnes' hand. The full impact of the slammed door was absorbed by the ring. Two flanges holding the solitaire diamond in place were broken by the impact. Agnes, crying with pain, quickly withdrew her

---

[1] All references hereinafter made will be to the Internal Revenue Code of 1954 unless otherwise indicated and specified.

injured hand, shaking it vigorously. The diamond dropped or flew out of the broken setting and has never been seen since that time.

Immediately, an intensive search was launched which continued for weeks. Initially, a human chain of the five White children was formed. They combed intensively a 40-foot area of the driveway, as well as part of the adjoining lawn. Additionally, the driveway gravel in the immediate vicinity of the car was raked and put through a sieve. The search continued in a less intensive manner even after the snows came; petitioners were still hopefully looking for the stone upon occasion at the time of trial more than 3 years later. Unfortunately, all of these efforts were unsuccessful, and the diamond has never been recovered.

The ring had been insured for several years following its purchase, but was not insured during 1963 or for some years prior thereto. The fair market value of the diamond in October of 1963 was not less than the purchase price of the ring paid by John in 1950, $1,200. Agnes suffered an uncompensated loss of $1,200 in 1963, as a direct and proximate result of the accidental slamming of the car door upon her hand and ring.

In their return for 1963 petitioners claimed a deduction of $1,200 for the casualty loss of the diamond describing it as follows:

Uninsured loss of 1.38 carat diamond from engagement ring setting caused by car door accidentally being slammed on wife's hand. Loss of gem directly the result of breakage of setting from sudden impact of car door upon ring. (Loss based upon actual appraised value of ring.)

On April 12, 1965, respondent mailed a notice of deficiency to petitioners in which he determined an income tax deficiency for the year 1963 of $276. The deficiency was based upon an addition to income of $1,200 which resulted from respondent's disallowance of the $1,200 casualty loss petitioners had claimed for the ring. The statutory notice included the following explanation to petitioners:

It is determined that the loss deduction of $1,200.00 which you claimed on your income tax return for the taxable year ended December 31, 1963 for the loss of a diamond, is not allowable under any section of the Internal Revenue Code. Accordingly, your income is increased by that amount.

At no time prior to trial did respondent contest or raise the issue of the amount of the loss or the value of the diamond lost by Agnes from her ring.

OPINION

Respondent maintains that Agnes did not suffer a casualty loss within the meaning of section 165(c)(3) of the Internal Revenue Code

of 1954.[2] Respondent applies the familiar principle of *ejusdem generis* and concludes that the events which gave rise to the loss of the ring were not like or similar to a "fire, storm, [or] shipwreck" and therefore do not constitute "other casualty" under section 165(c)(3).

Petitioners contend that the circumstances surrounding the diamond's loss place it within the "other casualty" provision of section 165(c)(3). They urge that the loss was due to chance, and occurred suddenly and unexpectedly as a result of accident. They rely primarily upon our recent opinion in *William H. Carpenter*, T.C. Memo. 1966-228, on appeal (C.A. 6, Apr. 3, 1967), which they regard as factually indistinguishable, and in which we allowed a casualty loss deduction for damage to an engagement ring accidentally ground up in a garbage disposal. Respondent does not attempt to distinguish *Carpenter* or to escape its rationale here. Instead he flatly submits it was incorrectly decided and should not be applied. He urges that the loss suffered here was nothing more or less than an ordinary, everyday, domestic, household mishap and compares it to a mythical Johnny's tearing out of the knee of his new suit on his way to church or to his mother's breaking some china as she does the evening dishes. We cannot agree that the facts here present an ordinary, common, everyday domestic loss or mishap. Agnes did not just misplace, mislay, or lose her ring. If she had merely dropped it in the leaves on the gravel driveway we would be faced with that situation, but the evidence before us paints a far different picture of the casualty loss claimed here. The cases cited and relied on by respondent are inapposite.

With respect to the presence of accepted and essential casualty attributes, we find little to distinguish the situation now confronting us from other cases in which loss deductions arising from "other" casualties have been allowed. The events giving rise to the undisputed loss here were sudden, unexpected, violent and not due to deliberate

---

[2] Sec. 165 provides in pertinent part as follows:

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    (1) losses incurred in a trade or business;

    (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

    (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. *A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100.* \* \* \*

[Matter in *italic* added by sec. 208(a), Revenue Act of 1964, 78 Stat. 19, shown for information only as it does not apply to 1963, the year before us.]

434

or willful actions by petitioners or either of them. These events involved the application of considerable destructive force to the subject ring and as an immediate, direct, and proximate result thereof Agnes lost the diamond from her solitaire. The relative presence of these characteristics has long been deemed controlling in determining whether a loss may qualify as "other casualty." See, e.g., *Harry Heyn*, 46 T.C. 302 (1966); *Burrell E. Davis*, 34 T.C. 586 (1960), acq. 1963-2 C.B. 4; *Ray Durden*, 3 T.C. 1 (1944), acq. 1944 C.B. 8. As we observed in *Harry Heyn, supra* at 309, there are "numerous cases involving casualty losses, some of them difficult to reconcile with others either in result, theory, or language. We think a review of these cases would not serve any useful purpose here, since we are satisfied that on the facts before us there was plainly a casualty."

Respondent urges that in order to be embraced by the term "other casualty," an occurrence must be cataclysmic in character. He relies upon *Heyn*, wherein we held that an earthslide constituted a casualty under section 165(c)(3). We find respondent's reliance upon *Heyn* for this proposition totally misplaced. In *Heyn*, we merely observed that the physical characteristics of the landslide in question were those normally associated with a casualty and stated that the landslide "involved a sudden and violent movement of a large mass of earth that was cataclysmic in character, and was similar in nature to a fire, storm, or shipwreck." *Harry Heyn, supra* at 307, 308. Nowhere in *Heyn* did we hold or suggest that a loss must be in the nature of a cataclysm to qualify as a casualty. We simply took notice that the landslide in question was cataclysmic in character. To hold that a loss must be cataclysmic in order to qualify as some "other casualty" under section 165(c)(3) would be to limit the availability of the casualty loss deduction to circumstances which are virtually catastrophic in character.

We think it clear that the magnitude of the casualty is not and should not be the controlling factor in determining whether a questioned event qualifies for casualty loss deduction treatment. Such losses have long been allowed in situations which are considerably less than cataclysmic in character. For example, deductions for damage to personal automobiles where the damage results from the faulty driving of the taxpayer but is not due to his willful act qualify. I.T. 2408, VII-1 C.B. 85 (1928). Respondent's current regulations are to the same effect. Sec. 1.165-7(a)(3), Income Tax Regs.[3] See also *Shearer v. Anderson*, 16 F. 2d 995 (C.A. 2, 1927). It would appear that very slight automobile damage, when attended by the necessary suddenness, is now routinely allowed casualty loss treatment. As we specifically ob-

[3] Accord, *Elwood J. Clark*, a Memorandum Opinion of this Court dated Apr. 1, 1946.

served in *Harry Heyn, supra* at 308 : "Automobile accidents are perhaps the most familiar casualties today."

The casualty need not be of great or near-tragic proportions in order to qualify. Indeed, it is not frivolous to point out that the very casualties expressly enumerated in the statute (fires, storms, and shipwrecks) can and do occur in minor scope and with minor resulting losses. The kitchen grease fire which escapes control and causes but little loss is no less a fire and no less a casualty for purposes of section 165 (c) (3) than the metropolitan holocaust.[4] We see no reason why a different standard of scale should apply to loss occurrences which fall within the "other casualty" category; they too are deductible under the statute when the events giving rise to the loss, judged by the accepted and essential casualty characteristics, *supra*, smack sufficiently of casualty or accident proceeding from an unknown cause or resulting in an unusual effect of a known cause. *Ray Durden*, 3 T.C. 1 (1944).

The principle of *ejusdem generis* as it is presently applied does no violence to congressional intent. Its application has been consistently broadened so that wherever unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent application of the force because of the suddenness thereof or some disability, the resulting direct and proximate damage causes a loss which is like or similar to losses arising from the causes specifically enumerated in section 165 (c) (3). Further, mere negligence on the part of the owner-taxpayer has long been held not to necessitate the holding that an occurrence falls outside the ambit of "other casualty." *Shearer* v. *Anderson, supra* at 996; *Harry Heyn, supra* at 308. Needless to say, the taxpayer may not knowingly or willfully sit back and allow himself to be damaged in his property or willfully damage the property himself. In the instant case, while one or both of the petitioners may have acted negligently, certainly it cannot be said that either petitioner acted willfully or in a grossly negligent manner. The forceful slamming of the automobile door on a blustery fall day upon Agnes' hand and ring was clearly an unexpected accident. We hold that the resulting loss was a casualty within the meaning of the Code.

On brief respondent argues with some force that our allowances of casualty loss deductions for accidents which are not of major proportion will in future make the law in this area difficult of administration. On brief, he specifically asked the following rhetorical question, among others: "Query: Is it a casualty when Johnny tears out the knee of his new suit by playing too vigorously on his way to church * * *?" We think that since 1964 the problem raised by respondent's hypothetical

---

[4] We are not concerned here with amount of loss. A $100 minimum has been part of the statute since 1964. See fn. 2, *supra*. Rather we are concerned with the definitional aspects of casualty under the statute.

question has not posed serious difficulties in the administration of section 165 (c) (3). Section 208 (a), Revenue Act of 1964, 78 Stat. 19, which applies to losses occurring after December 31, 1963, amended section 165 (c) (3) so that a casualty is now allowed only to the extent that the amount of loss to an individual arising from *each* casualty exceeds $100.[5] This amendment should go far to allay respondent's fears over prospective application and administration of section 165 (c) (3) with respect to everyday household and other losses which are less than cataclysmic in impact or scope but which meet the judicially evolved definition of "other casualty."

The pertinent legislative committee reports on the amendment affirmatively indicate that the reason for its enactment was indeed to eliminate deductions for minor casualties incurred by taxpayers in everyday living. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 125, 175; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505, 561. The reasons for the amendment cited by both the House Committee on Ways and Means and the Senate Committee on Finance are identical and these reasons are set forth in almost identical language in both reports. The Senate report, *supra*, provides in pertinent part as follows at 1964–1 C.B. (Part 2) 561.

(b) *General reasons for provision*—Your committee agrees with the House that in the case of nonbusiness casualty and theft losses, it is appropriate in computing taxable income to allow the deduction only of those losses which * * * go beyond the average or usual losses incurred by most taxpayers in day-to-day living. In view of this, it is believed appropriate to limit the casualty loss deduction to those losses or thefts above a minimum amount. The minimum selected was $100 per casualty loss, since this corresponds approximately with the "$100 deductible" insurance carried by many individuals * * * with respect to such losses. This means that no deduction will be allowed in the case of an ordinary "fender bending" *accident* or *casualty*, but that *casualty* and theft losses will continue to be deductible (over the $100) in those cases where they are sufficient in size to have a significant effect upon an individual's ability to pay Federal income taxes. [Emphasis added.]

We think it clear from the language quoted above that Congress did not intend to change and in fact gave tacit approval to the judicially evolved definition of casualty which might frequently include the "ordinary 'fender bending' accident or casualty." The amendment to section 165 (c) (3) did not take effect until after the taxable year before us and does not affect the result or our allowance of loss in this case. We do believe, however, considering the purposes for which the

---

[5] Neither party has cited this amendment nor argued what bearing, if any, its enactment should have upon our decision. However, we take judicial notice of it. We would be remiss in failing to do so because we think the enactment properly affects our decision in this case for reasons appearing in our Opinion, *infra*.

amendment was enacted, that its passage throws light upon our decision here. Primarily, the new $100 minimum largely negates respondent's argument that allowance of the deduction in this and similar situations has opened or will open the floodgates upon him, creating a difficult administrative burden in determining the proper treatment to be accorded minor household or everyday accidents. Secondly, we think the method chosen by Congress to eliminate deduction treatment for minor losses is significant in that it did not attempt to tamper with existing statutory and judicial definitions of casualty. Rather, Congress merely decided to exclude casualties which did not result in losses exceeding $100; the committee reports, *supra*, seem expressly to recognize that many minor accidents would clearly qualify as casualties under the statute and its judicial interpretations. Automobile accidents, certainly in the "other casualty" category, were specifically mentioned. We think that the amendment's passage, in light of the language in the respective reports, *supra*, indicates tacit retrospective approval by Congress of judicial decisions tending to recognize that "other casualty" per se need not mean an occurrence of catastrophic, catacylsmic, calamitous, or even necessarily severe consequences to the individual affected.

As we suggested earlier, the question of whether or not a deductible "other casualty" has occurred is a question of fact involving the application of accepted criteria to the facts of each case. We have already made plain our conclusion that the events which occasioned the loss of Agnes' diamond meet these criteria.

Respondent argues further that under the factual situation presently confronting us, even if the events which transpired constitute a casualty, the loss of the diamond did not result or arise from the casualty, which was the slamming of the door upon Agnes' hand. Respondent asserts that the diamond's loss resulted from Agnes' deliberate shaking of her injured hand. Under the facts of this case, respondent's contention is without merit. It is impossible to determine conclusively from the record whether the diamond "went flying" before or after Agnes shook her hand violently or merely dropped out after the flanges holding it in place were broken. Surely, in either event, the loss was caused by the accidental and forceful slamming of the door on the ring; Agnes' shaking of her hand in great pain was the immediate, direct proximate, and inevitable result of the forceful slamming.

Finally, it is appropriate to comment additionally that we are convinced after consideration of the entire record, giving due weight to

John's demeanor and testimony at trial, that the diamond was irrevocably and irretrievably lost during 1963.

Respondent, for his part, has not urged that an identifiable event fixing the loss is lacking. He also apparently agrees that if a casualty loss was sustained, the diamond had no value after the loss. As in a theft situation, the diamond was completely removed from the enjoyment of its owner. Normally, the deduction is computed by comparing pre-casualty and post-casualty market values. Sec. 1.165–7(b), Income Tax Regs. Here respondent halfheartedly argues that even assuming *arguendo* that petitioners suffered a casualty loss the deduction should be disallowed because of petitioners' failure to establish the pre- and post-casualty fair market value of the diamond. We have found as a fact, however, that the ring had a fair market value of $1,200 immediately prior to its loss. Any slight value remaining in the simple four-pronged solitaire mounting with two prongs broken off was *de minimis* and respondent does not even argue that any adjustment should be made because the damaged setting was also not lost. The loss suffered was therefore the amount claimed, $1,200.

Respondent does not actually dispute petitioners' pre-casualty valuation of the diamond. He merely urges that John's testimony is not sufficient to establish value. As our findings reflect, respondent at no time prior to trial contested or disputed the amount of the loss claimed. Petitioners' statement at trial that the question of valuation had never come up as an issue at any time is undisputed. Neither the deficiency notice, the pleadings, nor any portion of the opening statements at trial mention a dispute as to value of the diamond or amount of the loss. John's testimony, his appearance and demeanor at trial and on the witness stand satisfy us that he is not inclined to exaggerate or make claims that are unfounded. His testimony as to the cost and value of the engagement ring he bought and gave to his wife is undisputed and entirely convincing. In the light of all the circumstances we have found on the evidence before us that the pre-casualty market value of the ring was $1,200. That is the amount of the loss which petitioners are entitled to claim as a casualty deduction. We believe that in situations similar to the instant case, where post-casualty appraisal is impossible or irrelevant because the subject property has been completely removed from the owner's possession and enjoyment, the post-casualty fair market value should be considered to be zero. This is the approach adopted by respondent in the highly analogous theft area. See sec. 1.165–8(c), Income Tax Regs.

*Decision will be entered for the petitioners.*