WILLIAM E. AKSOMITAS, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 252–67.     Filed July 31, 1968.

William E. Aksomitas, pro se.
*William L. McCulley*, for the respondent.

HOYT, *Judge:* Respondent determined a deficiency in income tax of $1,175.66 against petitioner for the taxable year 1964.[1] Two issues are presented for our decision:

(1)  Whether petitioner is entitled to a casualty loss deduction under

---

[1] This deficiency arose on a prerefund audit, and the net deficiency in income tax is actually $151.80, computed as follows:

| | |
|---|---:|
| Statutory deficiency | $1,175.66 |
| Unrefunded excess prepayment credits | 1,023.86 |
| Net deficiency | 151.80 |

section 165(c)(3), I.R.C. 1954,[2] because of damage sustained by his yacht during that year.

(2) Whether petitioner may deduct under section 217, I.R.C. 1954, certain costs incurred in attempting to make the yacht seaworthy and in transporting it under its own power toward Florida, his new place of employment.

The proper amount of petitioner's medical deduction is also in issue. However, the resolution of this question involves a purely mathematical computation which is based upon whether or not respondent was correct in increasing petitioner's adjusted gross income in connection with the disallowed casualty loss and moving expense deductions.

### FINDINGS OF FACT

Some of the facts have been stipulated, are found accordingly, and incorporated herein as part of our findings.

Petitioner is William E. Aksomitas, a mechanical engineer. He resides in Juno Beach, Fla. He and his wife filed a joint Federal income tax return for the taxable year 1964 with the district director of internal revenue, Jacksonville, Fla. However, the wife did not join in the petition and William E. Aksomitas is the sole petitioner.

Petitioner himself moved to Florida in September 1961, when he was reassigned by his employer, the Pratt & Whitney Aircraft Co., to its Florida Research and Development Center in West Palm Beach. Prior to the reassignment, petitioner had been employed by Pratt & Whitney in East Hartford, Conn., for a period of 6 years and 3 months. The job transfer to Florida was considered "transitory" since it contemplated in-house training for a subsequent assignment to an undisclosed location as a field project engineer. However, in June of 1962 petitioner was made a permanent assignee at West Palm Beach and he thereafter moved his family to Florida in July of 1962; their household goods were moved in September of that year, approximately 1 year after the commencement of petitioner's work in Florida.

During July of 1960, more than a year before he was transferred to Florida for in-house training, petitioner purchased a 45-foot diesel-powered yacht, *Tradewinds*, for $6,000. The yacht was described by petitioner as being an "old boat." Its big and very heavy diesel engine had never been reoriented or moved from its mountings. In 1962, when petitioner's family moved from Connecticut to Florida, the boat, which was then in drydock, suffered from sundry defects and conditions which rendered it unseaworthy and unable to negotiate a journey of any distance.

---

[2] Unless otherwise noted, all statutory references herein shall be to the Internal Revenue Code of 1954.

It was petitioner's desire, after moving his family to Florida in July of 1962, either to move the yacht to Florida (by means of a hired pilot and crew) or to sell it in Connecticut and invest the proceeds in a new boat in Florida. After the family's departure from Connecticut, petitioner's sister, Louise Aksomitas, became his representative to handle arrangements regarding the boat. During a 2-year span of time (July 1962–August 1964), after the family's move to Florida, several definite plans were formulated to move the yacht to Florida under its own power, and pilots were actually hired for this purpose. However, petitioner experienced many difficulties in trying to get the yacht ready, and it was not in physical condition to commence the move during this 2-year period; none of the planned voyages ever materialized. During this period, the boat was berthed or in drydock at not less than three shipyards in the Hartford, Conn., coastal area. In the winter of 1962 and the spring of 1963, petitioner realized that without "a major overhaul and a major repair" it would be futile to even attempt to sail the yacht to Florida. It was, in petitioner's words, in a state of "unwarranted degeneration and depreciation."

Petitioner would have been willing to sell the boat rather than undertake to have it piloted to Florida and attempts were in fact made to sell it at $6,000, the price which had been paid for it. Petitioner received one "pretty bona fide offer" at this price, but the proposed sale fell through when the prospective buyer was unable to arrange financing. Several lesser, rather indefinite, offers of approximately $4,000 were turned down, but exactly when this occurred does not appear of record.

While the boat was in the various Connecticut shipyards awaiting either movement to Florida or sale, sundry additions, improvements, and repairs were called for if the petitioner should finally decide to keep the boat rather than sell it. As mentioned, pilots were actually signed on, but the boat was not capable of the journey prior to the summer of 1964. The items requiring attention included, *inter alia*, obtaining a workable radio and lights, new batteries, an anchor and a dinghy, preventing actual water leakage and seepage through openings in the hull, replacing fittings and canvas, repairing the stuffing box and rear bearing, and, most important, the repair of a bent propeller shaft which caused related damages. Petitioner had been aware of the bent propeller shaft as early as December 1962, when he made a trip back to Connecticut to attend to certain matters relative to the boat. During this visit, which was the last time petitioner personally inspected the boat, petitioner himself observed the defect in the propeller shaft and resulting damages. Thereafter the boat leaked badly whenever it hit the water and the bent shaft caused vibrations and damage to the log and stuffing box.

During the summer of 1964, petitioner and his agents in Connecticut believed that the *Tradewinds* had been brought to a state of repair which would allow the journey to Florida to be undertaken. In June of 1964 (or perhaps at some earlier time, the record being inexact), the Essex Boat Works repaired, at least to some extent, the propeller shaft, the diesel motor flange, and the stuffing box on the boat, in addition to performing "other sundry work." Exactly what was done or what the cost of the repair work amounted to does not appear of record; in spite of petitioner's testimony that a major overhaul and repair job would be required to correct the shaft problems and to make the boat seaworthy, no evidence was introduced to substantiate that such a major job was in fact performed. At most, from the conflicting evidence of record, it appears that less than $200 was spent to do some repair work in 1964.[3]

In mid-August of 1964 a pilot and two crewmen were signed on and the *Tradewinds* left home port in Connecticut on or about August 20 for Florida under her own power. She had progressed as far as the southern tip of Manhattan Island, a distance of about 95 miles from the trip's point of origin in Essex, Conn., when disaster struck. Here, on August 20, in the East River, the boat was disabled with a broken propeller shaft, with consequent flooding. The New York City Harbor Police rendered assistance by towing the boat back up the East River to Blackwell's Island. Here the U.S. Coast Guard took over and towed it to the Harlem River, at which point a private boatyard, the Ludlow Marine Corp., was contacted by telephone. The Coast Guard assistance report ascribes the disablement to engine failure.

Responding to the telephone call, Ludlow Marine sent its work boat to the Harlem River near 225th Street and towed the *Tradewinds* to its docks in Yonkers. Upon arrival at the Ludlow yard Captain Warren Hedges requested N. B. Miller, Ludlow's president, to come on board to inspect the damage and make repair estimates. Miller and Jack Schick, the Ludlow foreman, went aboard and were "amazed" to find the propeller shaft, which was approximately 2½ inches in diameter, broken and completely severed between the engine and the shaft log. There was a steady stream of water coming into the boat from the bottom at the shaft log and stuffing box. Examination of the situation revealed only two alternative means by which the boat could satisfactorily be restored to running condition, both of which were considered "major operations" by Ludlow Marine. No estimate of the repair cost

---

[3] Petitioner testified that he had a bill from Essex Boat Works for this work, which he paid in 1964, in the amount of $180.26, and on brief he states that on May 1, 1964, he paid $238.28 for initial propeller shaft repairs made in the fall of 1963, but the record is devoid of any evidence as to this. One exhibit in evidence, a schedule of 1964 bills and payments for yacht expenses, shows "Essex Boat Works 190.26."

was made or given. The pertinent part of the explanatory letter written from Ludlow Marine (by N. B. Miller) to petitioner's sister, Louise, described the alternatives as follows:

One was to remove the shaft log and replace it so that the shaft would be properly aligned; the other was to change the position of the engine to accomplish the same end result.

After the *Tradewinds* was taken to Ludlow Marine in Yonkers, petitioner's brother, Albert, assumed general responsibility for gathering repair estimates and for making ultimate disposition of the craft. Petitioner and his brother conferred at length via telephone and finally they concluded that it would cost "thousands" to repair the *Tradewinds*. However, no estimates as to the cost of repairs were ever obtained. Petitioner decided to dispose of the boat and *Tradewinds* was sold for $900 a few days after disablement to the Tri-Boro Shipyard. Tri-Boro purchased the boat in order to obtain the diesel power plant still on board.

Petitioner incurred at least the following expenses in connection with his attempt to move the *Tradewinds* from Connecticut to Florida:

| | |
|---|---:|
| Transient storage (at Glastonbury) following competion of needed repairs | $45. 00 |
| Fuel | 79. 00 |
| Payment to Warren Hedges, pilot | 215. 28 |
| Payments to Hartford Times—Ads for pilot | 20. 82 |
| Liability insurance for trip to Florida | 120. 75 |
| Total | 480. 85 |

In his 1964 income tax return petitioner claimed $5,400 as a deduction for "Loss of 45 ft. yacht *Tradewinds* due to flooding in Long Island Sound. Salvaged by U.S. Coast Guard." and $800 as moving expenses described on an attached schedule (Form 3903) as transportation of household and personal property. He also claimed a medical and dental expense deduction of $84.50.

In his deficiency determination, respondent denied the moving expense deduction of $800 and the casualty loss deduction of $5,400. He also disallowed $31.88 of the medical expense deduction claimed.

#### ULTIMATE FINDINGS OF FACT

The damage to and flooding of petitioner's yacht *Tradewinds* on August 20, 1964, was due to mechanical failure and not to external forces or causes. No damage was sustained by the yacht in 1964 as a result of fire, storm, shipwreck, or other casualty; almost all costs and expenses incurred by petitioner in connection with his yacht in 1964 were in the nature of repairs to, maintenance of, or improvements thereto and not in connection with moving her to Florida.

OPINION

## *Issue 1. Casualty Loss*

The first issue presented for decision is whether petitioner sustained a deductible casualty loss when the *Tradewinds* became disabled. Petitioner's basic factual contention is that the propeller must have struck a solid object in the water, and that this sudden accident caused the shaft to break as it did. Respondent's contention is that petitioner has not proved that the loss arose from an event possessed of the accepted casualty attributes and suggests that, if anything, the record indicates that the disablement and consequent damage to petitioner's yacht resulted from longstanding mechanical or structural defects. Additionally, respondent urges that the measure of the alleged loss has not been proven. We agree with respondent.

Section 165(c)(3) provides in pertinent part that casualty losses shall be limited to those arising from "fire, storm, shipwreck, or other casualty." Most reported cases involve losses in the "other casualty" category, rather than one of the specific loss categories. It is not clear whether either of the parties contemplates that *Tradewinds'* disablement and damage arguably amounted to a "shipwreck." Petitioner cites no cases whatever, and respondent's cited cases are "other casualty" cases. We discover no casualty loss case where the issue was whether a shipwreck had occurred. We are confident, however, that the casualty characteristics which are so important in the "other casualty" cases should also be determinative of our decision as to whether any loss allowed by section 165(c)(3) occurred here.

We have long applied the rule of *ejusdem generis* to extrapolate the accepted "other casualty" characteristics from the common characteristics of the three casualties specifically enumerated in section 165(c) (3). See, e.g., *John P. White*, 48 T.C. 430, 433 (1967). The most important of these characteristics is the application of external and sudden force. As we suggested in *John P. White, supra* at 435, casualty events occur when "unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent application of the force because of the suddenness thereof or some disability." The burden of proof to establish the casualty and that the damages which occurred were the direct and proximate result thereof rests upon the taxpayer, and he must establish by a preponderance of the evidence that he is entitled to the deduction sought.

To relate this discussion to the facts of this case and the factual contentions of the parties, respondent's position is that petitioner has not proved the sudden invasion of a hostile force which is required in cases of this type. In our opinion, it is clear that this sudden force must

be proved whether the deduction is sought on the theory that the damages resulted from a shipwreck, or on the theory that they were the result of "other casualty." Petitioner, for his part, does not seem to dispute that a sudden, forceful accident is required. The core of his argument has been that the *Tradewinds'* propeller must have struck an object in the water causing the shaft to snap. While this hypothetical collision might well give rise to a casualty loss, petitioner has unfortunately not sustained his burden of proving that the collision he urges did in fact occur. At most, he has expressed his opinion that it did in fact happen and shown that it is a possible explanation for the broken shaft. However, the preponderance of the evidence of record supports the opposite contention that there was a longstanding defect in the alignment of the propeller shaft which caused it to break.

Petitioner had noted difficulties with the drive shaft, rear bearing, and shaft log as early as December of 1962, the last time he actually saw the boat. Repairs had been undertaken to correct the situation, but petitioner, who was his only witness at trial, was apparently not able to testify categorically that this historical defect had been corrected. In 1964, when the voyage southward was commenced, petitioner had not laid eyes upon his boat for 20 months. In the opinion of Warren Hedges, petitioner's pilot, who was on board and in charge when the boat became disabled, the cause of the break in the propeller shaft "was that the shaft and engine were not in alignment." There is absolutely no evidence or even a suggestion, other than petitioner's opinion, that the propeller or any portion of the boat struck a submerged object. It is merely petitioner's surmise, opinion, or assumption that the shaft would not have been sheared off unless the propeller had struck a solid object causing this damage. Petitioner was not there at the time. Hedges, who was there as the pilot, makes no suggestion to support petitioner's theory. The Coast Guard report, made after they rendered assistance to the *Tradewinds* on August 20, states that the breakdown was because of "engine failure."

In the opinion of N. B. Miller, the president of the yard to which *Tradewinds* was towed, the break in the propeller shaft could have been caused either by the propeller's striking an underwater object, or by the misalignment of the shaft and the engine. This is far from sufficient to establish the claimed casualty as the cause of the damages in question.

In light of the entire record before us, including the opinions expressed above and especially that of Hedges, we are compelled to conclude and hold that petitioner has failed to prove that the disablement was due to something other than the preexisting mechanical defect.

Hedges, after all, was on board and in command at the time of the questioned occurrence. It is not impossible that the loss arose as petitioner alleges, but he has failed utterly to prove this course of events, and as we have already mentioned, the preponderance of the evidence indicates that *Tradewinds* was an old boat with continuing structural and mechanical difficulties which grew worse as time passed.

Even if we were to reach a contrary conclusion and accept petitioner's view that a casualty has been proven, we would still be compelled to sustain respondent's determination on this issue because petitioner has not proven the measure of his loss. Indeed, he has not really attempted to do so.

The usual method of establishing the amount of loss is to prove precasualty and postcasualty market values. In certain cases, it may be proper to prove the cost of replacement or repair. The only evidence of record relating to the cost of repair is petitioner's statement that repair would have cost "thousands." We are even less informed about precasualty and postcasualty market values. No appraisals or other estimates of any description were introduced as to value either immediately before or immediately after the disablement. All we know is that the *Tradewinds* was purchased in 1960 for $6,000, gave constant mechanical and other trouble to its unfortunate owner, and was sold for $900 in 1964 shortly after becoming disabled. We think it significant that petitioner was willing to sell the boat for $6,000 after moving to Florida, but was unable to conclude a sale at this price. Also, in petitioner's own view, the boat depreciated and degenerated between 1961 and 1963. Petitioner received offers at lesser amounts which were unacceptable to him, but even these were not definitely established as to time or amount.

In light of the meager evidence of record respecting valuation, we think it indisputable that petitioner has failed to prove the amount of his loss, even if the disablement constituted a casualty event. Any attempt to determine the precasualty value of *Tradewinds* would be pure speculation. The measure of the loss has not been established at all even if we deem that a casualty occurred, which, of course, we do not.

*Issue 2. Moving Expenses*

Section 217 provides in pertinent part as follows:

SEC. 217. MOVING EXPENSES.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction moving expenses paid or incurred during the taxable year in connection with the commencement of work by the taxpayer as an employee at a new principal place of work.

(b) Definition of Moving Expenses.—

(1) In general.—For purposes of this section, the term "moving expenses" means only the reasonable expenses—

(A) of moving household goods and personal effects from the former residence to the new residence * * *

Petitioner maintains that he should be entitled to deduct $800 in costs which he claims were incurred in connection with moving his yacht, the *Tradewinds*. Respondent claims the costs incurred are not allowable under section 217 because the *Tradewinds* did not constitute "household goods" or "personal effects."

We have found as a fact that petitioner did incur expenses of $480.85 in connection with the attempted move. The remainder of the expenses which petitioner substantiated at trial and explained on brief were related to ordinary storage, repair, or maintenance of or additions or improvements made to the vessel prior to the attempted move, or were not proved to have been incurred in connection with the attempted move. Petitioner apparently believes he was acting most conservatively in claiming only $800 as a deduction.

While we are convinced that expenses of $480.85 were reasonably incurred in connection with moving petitioner's yacht from Connecticut to Florida, we must agree with respondent that the *Tradewinds* is not the kind of property, the moving costs of which were made deductible by the Congress. Section 217, *supra*, states simply that allowable "moving expenses" means only the "reasonable expenses of moving *household goods* and *personal effects* from the *former residence* to the *new residence*." (Emphasis supplied.) The *Tradewinds* a 13½-ton, 45-foot diesel yacht, cannot be considered by any stretch of the imagination as property within the meaning of "household goods" or "personal effects" as those terms are used in section 217(b) (1)(A).

Nothing in the legislative history, in the statute itself or in the regulations even suggests that those terms should be given other than their commonly understood meaning in applying the statute. Even Webster's dictionary, the sole authority cited and relied on by petitioner in his brief, lends no support to petitioner's position that his boat should be included in the terms used in the statute. See Webster's New International Dictionary (2d ed. 1944); Webster's Third New International Dictionary (1966). See also *In re May's Estate*, 135 Minn. 299, 160 N.W. 790 (1917), relied on and cited by respondent.

We regard it as significant that Congress did not choose to include personal property generally or all chattel property in section 217, but limited the covered property to items having intimate association with the home or the person at the former residence. Accordingly, we must conclude and hold that petitioner may not deduct any por-

688

tion of the expenses he incurred in having his yacht sailed to Florida in 1964 as moving expenses for household goods and personal effects under section 217. Needless to say, the other yacht expenses incurred in 1964 for repairs, maintenance, and outfitting the yacht are also not deductible.

Because respondent's disallowance of the casualty loss and moving expense deduction is sustained, the corresponding increase in adjusted gross income dictates that petitioner's medical expense deduction also be reduced by the amount disallowed in the deficiency notice.

*Decision will be entered for the respondent.*