WILLIAM R. CLEM AND JANINE F. CLEM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clem v. Commissioner
Docket No. 16864-89
United States Tax Court
T.C. Memo 1991-414; 1991 Tax Ct. Memo LEXIS 463; 62 T.C.M. (CCH) 586; T.C.M. (RIA) 91414; August 22, 1991, Filed *463 Decision will be entered under Rule 155. Donald O'Neil Heck, for the petitioners. J. Robert Cuatto, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to tax
Year
Deficiency
sec. 6651(a)(1)
1979
$ 1,220
($ 286.75)
1980
2,136
(231.75)
1981
3,999
399.90 After concessions by the parties, the issues are (1) whether petitioners sustained a casualty loss within the meaning of section 165 of $ 119,500 in 1981, and (2) whether petitioners are liable for additions to tax under section 6651(a)(1). All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners William R. Clem (Mr. Clem) and Janine F. Clem (Mrs. Clem) are husband and wife and resided in Scottsdale, Arizona, at the time of the filing of their petition. In June 1982, petitioners filed joint Federal income *464 tax returns for the years 1979, 1980, and 1981 and in November 1983, filed amended joint income tax returns for the same years. Mr. Clem was employed by Merrill Lynch International (Merrill Lynch) as a stockbroker during all relevant times. In 1978, Mr. Clem was transferred by Merrill Lynch to its office in Teheran, Iran, and departed for Iran in July 1978. His wife and daughter followed him later that year. Merrill Lynch provided for the transportation of petitioners' personal and household belongings from their Scottsdale, Arizona, home to Iran. The shipping costs, including the cost of insurance, were paid by Merrill Lynch. Merrill Lynch arranged with Allied Van Lines (Allied) to ship petitioners' goods to Teheran, Iran. After Mr. Clem left for Iran, Allied packed and loaded petitioners' household goods at their Scottsdale, Arizona, home during the summer of 1978. Many of petitioners' receipts and records regarding their belongings were included in the shipment. Only Mrs. Clem was present during the loading of petitioners' belongings in preparation for shipment. At that time, an Allied employee asked whether and at what amount Mrs. Clem wanted to insure the shipment. *465 Mrs. Clem, not ever having been responsible for the shipment of household goods, initially requested $ 30,000 insurance, believing that amount was more than sufficient to cover possible breakage and not an estimate of the total value of the goods being shipped. The Allied employee suggested a higher amount, and the goods were eventually insured for $ 50,000. Allied was required to deliver petitioners' household goods to Teheran, Iran. The goods were shipped via ocean vessel and arrived in Iran sometime during the summer of 1978. The goods, however, were not immediately unloaded because of customs problems and increasing civil chaos which culminated in the outbreak of the Iranian revolution during the fall of 1978. Although petitioners requested that their belongings not be removed from the ship, Allied unloaded the goods onto the dock at Khorramshahr, Iran, and cleared them through Iranian customs. Due to the worsening civil unrest and growing anti-American fervor, Merrill Lynch instructed its employees and their families to leave Iran. Mrs. Clem and petitioners' daughter left Iran in late 1978, while Mr. Clem remained until December 1978. Merrill Lynch closed its office in *466 Teheran in January 1979, and Mr. Clem was reassigned to the Merrill Lynch office in Dubai, United Arab Emirates. Petitioners instructed Allied to deliver their goods to Dubai and Allied agreed to do so. For reasons that are unclear, the goods were subsequently moved by Allied from the dock at Khorramshahr, Iran, to the port at Bandar Khomeini, Iran. Allied told petitioners that their goods would be shipped to Dubai, United Arab Emirates, but they were not. The hostage crisis arose in late 1979 making communications in and out of Iran for an American citizen and American corporation difficult, if not impossible. Petitioners attempted to locate their belongings from 1979 until 1981. In 1981, Allied told petitioners that it could no longer locate petitioners' goods and that the goods had never left Bandar Khomeini, Iran. Allied stated that petitioners' goods were lost and would not be recovered. Allied disclaimed liability for petitioners' lost goods both generally and under the insurance policy stating that they were lost due to an uncovered risk. Petitioners have not recovered any of the personal and household goods that they shipped in 1978. Petitioners sustained a casualty *467 loss in 1981 in the amount of $ 85,100. OPINION The issues for decision are (1) whether petitioners sustained a casualty loss within the meaning of section 165 of $ 119,500 in 1981, and (2) whether petitioners are liable for the additions to tax under section 6651(a)(1). To decide the first issue, we must determine (1) whether petitioners sustained a casualty or theft loss, (2) if so, in which tax year was the loss sustained, and (3) the amount of that loss. Section 165(a) provides generally for a deduction for any uncompensated loss "sustained during the taxable year." Section 165(c) limits loss deductions for individuals to those losses incurred in a trade or business, incurred in any transaction entered into for profit, or (if neither of the first two apply) those that "arise from fire, storm, shipwreck, or other casualty, or from theft." A loss is "actually sustained" in the taxable year in which the loss is evidenced by "closed and completed transactions, fixed by identifiable events." Sec. 1.165-1(b), (d)(1), Income Tax Regs. Petitioners have the burden of proving that the loss resulted from "fire, storm, shipwreck, or other casualty, or from theft," within the meaning *468 of section 165(c)(3). We hold that petitioners have carried their burden of proof. There is no contention that petitioners' loss was incurred by any activity of a trade or business or resulted from a transaction entered into for profit. Petitioners' loss here is most probably not due to any of the enumerated casualties (fire, storm, or shipwreck) and, therefore, must be either an "other casualty" or "theft" within the meaning of section 165(c)(3) in order to be deductible. Whether or not a deductible "other casualty" has occurred is a question of fact. White v. Commissioner, 48 T.C. 430 (1967). An "other casualty" has been described as the complete or partial destruction of the taxpayer's property resulting from an identifiable event of a sudden, unexpected, and unusual nature. Fay v. Helvering, 120 F.2d 253 (2d Cir. 1941). Although respondent's revenue rulings are not authoritative, we note that respondent has described the terms sudden, unexpected, and unusual as -- To be "sudden" the event must be one that is swift and precipitous and not gradual or progressive. To be "unexpected" the event must be one that is ordinarily unanticipated *469 that occurs without the intent of the one who suffers the loss. To be "unusual" the event must be one that is extraordinary and nonrecurring, one that does not commonly occur during the activity in which the taxpayer was engaged when the destruction or damage occurred, and one that does not commonly occur in the ordinary course of day-to-day living of the taxpayer. [ Rev. Rul. 72-592, 1972-2 C.B. 101, 102.]
The Senate Finance Committee revisited the policy behind the limitation of nonbusiness loss deductions for individuals when it added the $ 100 nondeductible floor in 1963, stating -- [the] committee agrees with the House that in the case of nonbusiness casualty and theft losses, it is appropriate in computing taxable income to allow the deduction only of those losses which may be considered extraordinary, nonrecurring losses, and which go beyond the average or usual losses incurred by most taxpayers in day-to-day living. * * * [S. Rept. No. 830, 88th Cong., 2d Sess., 1964-1 C.B. (Part 2) 505, 561.]
Respondent claims that petitioners have not suffered an "other casualty," arguing that petitioners "cannot point to any identifiable *470 event of a sudden, unexpected or unusual nature which caused the loss of their goods." We have held, however, that in the unusual circumstance when a taxpayer does not, and cannot, know the exact nature of fate which beset his property for reasons beyond his control, a casualty loss deduction is not precluded so long as he can prove that it is more likely than not that the loss was occasioned by an event that fits within the meaning of "other casualty" of section 165(c)(3). Popa v. Commissioner, 73 T.C. 130 (1979); Thomason v. Commissioner, T.C. Memo 1983-563. Respondent correctly points out that a governmental taking does not constitute a theft. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 11 L. Ed. 2d 804, 84 S. Ct. 923 (1964); Powers v. Commissioner, 36 T.C. 1191 (1961). Respondent asks us to conclude that "the only inference which can be drawn from the record," namely, that the Iranian Government acting under color of legal authority confiscated petitioners' belongings, precludes a casualty loss deduction. Powers v. Commissioner, supra.We find this conclusion to be neither "the only" one nor one *471 that is more likely than not. It is simply one of many possible explanations for an event the exact nature of which cannot be known by petitioners or respondent. Petitioners' goods were delivered to a common carrier in Scottsdale, Arizona. The goods were shipped by ocean vessel to Iran where they were unloaded into what was becoming an increasingly hostile, violent, anti-American environment. Petitioners' goods could have been pilfered, looted, burned, or otherwise destroyed or vandalized. We note that during the time period after the arrival of petitioners' goods, Iran experienced increasing civil unrest. Anti-Americanism pervaded the revolutionary movement sweeping Iran, culminating in the attack on the American Embassy in November 1979 and the hostage crisis that continued for more than a year thereafter. See, e.g., Continental Illinois Corp. v. Commissioner, 94 T.C. 165 (1990); Halliburton Co. v. Commissioner, 93 T.C. 758 (1989). Spontaneous "self-help" or other retribution by dockworkers, nearby residents, or others against what could be easily identified as the property of Americans is a more plausible explanation than official *472 confiscation under color of state law. Respondent also argues that Mozayeny v. Commissioner, T.C. Memo 1987-188, "mandates" a finding that a governmental confiscation occurred. The taxpayer in Mozayeny claimed a casualty loss deduction for a home in Iran that he claimed was confiscated by the Iranian government. The taxpayer in that case, however, provided no credible evidence, and the Court found he totally failed to prove the existence of the house, that he owned it, and his basis in it. The Court denied the deduction on the grounds of lack of substantiation, rather than governmental confiscation. Any discussion of confiscation in that case is dicta, and does not establish any necessary conclusion that goods lost or left in Iran during the Iranian revolution were confiscated by the government as a matter of law. Petitioners argue that this situation is ejusdem generis to losses due to "fire, storm, and shipwreck." This Court has used this principle to apply section 165(c)(3) and held that the section -- has been consistently broadened so that wherever unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent *473 application of the force because of the suddenness thereof or some disability, the resulting direct and proximate damage causes a loss which is like or similar to losses arising from the causes specifically enumerated in section 165(c)(3). * * * [White v. Commissioner, 48 T.C. at 435.]
Like the situation in Popa v. Commissioner, 73 T.C. at 130, this case is within the proper application of ejusdem generis. In Popa, the taxpayer left his property in his Saigon, Viet Nam, apartment to go on a business trip. Days later, the U.S. military pulled its remaining troops out of Saigon and hostile forces took the city. Since the taxpayer could not return to Saigon to retrieve his belongings due to the hostile environment, he did not, and could not, know exactly what happened to his property. In finding that the taxpayer's loss was deductible, we recognized, as we do here, the long line of cases requiring the taxpayer to prove his loss. United States v. White Dental Co., 274 U.S. 398, 71 L. Ed. 1120, 47 S. Ct. 598 (1927); Wahlert v. Commissioner, 17 T.C. 655 (1951). We went on to hold, however, that "in unusual circumstances such *474 as this, we do not think it fair or reasonable to require that the taxpayer eliminate all possible noncasualty causes of his loss." Popa v. Commissioner, supra at 133. Petitioners' property in this case was lost in a similar manner -- civil unrest and violent anti-Americanism prevented petitioners from retrieving their property and learning the precise way in which their goods were lost or destroyed. There can be no dispute that an actual loss occurred. Popa v. Commissioner, supra at 133. We find that the loss occurred in 1981 when Allied lost all connection with petitioners' goods because of the situation in Iran. This loss was not gradual, progressive, or anticipated as in Austin v. Commissioner, 74 T.C. 1334 (1980) (no casualty loss where the taxpayer cut down his trees due to their increasing encroachment on power lines). Nor was it the type of loss that occurs as a result of day-to-day living. It was occasioned without the fault or negligence of petitioners. See Aksomitas v. Commissioner, 50 T.C. 679 (1968) (no casualty loss where the taxpayer failed to repair known mechanical problems *475 with his boat which disabled and damaged the boat allowing further storm damage to occur). The loss was sudden, unexpected, and unusual. As we did in Popa, under unusual facts and circumstances like those here, we will not hold petitioners to an unreasonable and unfair requirement of identifying which specific casualty befell their property. We find that it is more likely than not that petitioners' property was destroyed, vandalized, pilfered, or otherwise lost in a cataclysmic way. Therefore, we find petitioners' sustained an "other casualty" loss in 1981 within the meaning of section 165(c)(3). We also must decide whether there was a reasonable prospect of recovery at the time of the loss. It is a question of fact to be determined upon an examination of all the facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs. We have stated previously that the mere denial of liability or insurance coverage alone, without more, is in itself insufficient to show that no reasonable prospect of recovery existed. Gale v. Commissioner, 41 T.C. 269 (1963). Our holding in Gale, however, is not to be read as axiomatic. We noted in Gale that in different *476 circumstances, an insurance carrier's denial of liability could fix the time of loss. Gale v. Commissioner, supra at 277. We also have held that such a denial would have to be viewed in light of the surrounding facts and circumstances and is a significant factor in determining the reasonableness of the prospects for recovery. Gale v. Commissioner, supra; Coastal Terminals, Inc. v. Commissioner, 25 T.C. 1053 (1956). Petitioners asked Allied about compensation for their lost goods, and it was refused both generally and under the insurance policy. Section 165 does not require the taxpayer to be an "incorrigible optimist." United States v. White Dental Co., 274 U.S. at 402. Petitioners were told they would not recover and initially did not pursue legal action. The circumstances of this loss were beyond the ordinary. The Iranian revolution presented certain war and civil unrest risks that usually do not arise in the average common carrier of household goods case. We note that Allied denied petitioners' claim for many of the same reasons that respondent continues to deny their claim. We conclude *477 that there was no reasonable prospect of recovery in 1981. The subsequent settlement with Allied in 1985 is not determinative that a reasonable prospect of recovery existed at the time of the loss. Tarakci v. Commissioner, T.C. Memo 1980-293. We further note that the subsequent $ 50,000 recovery from Allied in 1985 was appropriately included in income in petitioners' return for that year, thereby eliminating any "double dip." See Montgomery v. Commissioner, 65 T.C. 511 (1975). Respondent further argues that petitioners have not met their burden of proof as to the allowable amount of the deduction. We disagree. Petitioners must establish the amount of the loss. Towers v. Commissioner, 24 T.C. 199, 239 (1955), affd. 247 F.2d 233 (2d Cir. 1957). The deductible amount is the lesser of diminution in fair market value of the property or its adjusted basis. Sec. 1.165-7(b)(1), Income Tax Regs.Section 165(b) provides that the basis used for this purpose shall be the property's section 1011 adjusted basis for determining gain or loss on disposition. Section 1011 references section 1012 cost basis or other *478 applicable basis section. Petitioners, therefore, also must establish the appropriate basis according to how the property was acquired. Estate of Broadhead v. Commissioner, T.C. Memo 1972-195. Petitioners did not present any receipts or records at trial to support their claim since many of these records also were lost in the ill-fated shipment. This Court, however, has held that where credible testimony is given regarding which items were lost and the appropriate cost or other basis for those items, such testimony is sufficient to substantiate the amount of the loss deduction. Duff v. Commissioner, 23 B.T.A. 1343 (1931); Hartmann v. Commissioner, 14 B.T.A. 146 (1928); Cavell v. Commissioner, T.C. Memo 1980-516; Lowenthal v. Commissioner, T.C. Memo 1968-79. In the instant case, the parties stipulated to the specific items that were shipped to Iran and were lost. Petitioners presented testimony regarding the cost or other basis of each lost item and how petitioners acquired it. We found petitioners credible and their testimony highly probative of the basis of the lost goods. *479 While we have no independent evidence of the property's fair market value at the time of loss, these goods were certainly worth something. Many of the lost goods were of a kind that clearly appreciated in value. See appendix A. We conclude that their values at the time of loss exceeded petitioners' adjusted bases. Thus, such basis shall be used to calculate the amount of the loss. Sec. 1.165-7(b)(1)(ii), Income Tax Regs. The remaining items likely declined in value prior to the loss, but again they were clearly worth something. See appendix B. Their value to petitioners after the loss is zero. It is unfair and unreasonable to allow no deduction. Therefore, based upon the well-established Cohan rule and its reasoning, we have done our best to approximate a reasonable fair market value. Sec. 1.165-7(b)(1)(i), Income Tax Regs.; Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). We find the deductible amount of the loss is $ 85,100 as set forth in appendices A and B. On brief, respondent renewed his hearsay objection raised at trial to the Affidavit of Janine F. Clem and her testimony as to petitioners' basis in the lost goods after the affidavit *480 was provided to her on the stand. We find that the affidavit is recorded recollection within the meaning of Rule 803(5) of the Federal Rules of Evidence, and that it was properly admitted into evidence. Mrs. Clem's testimony as to petitioners' basis is therefore proper. See also United States v. Campbell, 221 U.S. App. D.C. 367, 684 F.2d 141 (D.C. Cir. 1982). Respondent's notice of deficiency included additions to tax under section 6651(a)(1) because petitioners' returns for the years at issue were not timely filed. Section 6651(a)(1) allows the taxpayer to avoid the additions if it can be shown that the failure to file was due to reasonable cause and not due to willful neglect. Petitioners did not put forth any evidence on this point. Therefore, we hold that petitioners are liable for additions to tax under section 6651(a)(1) in amounts which will be calculated under Rule 155. Decision will be entered under Rule 155. Appendix A
Cost or
Amount
Item
Acquisition
other basis
allowed
Smyrne carpet
inherited
$ 15,000
$ 15,000
Iranian carpet
gift
6,000
6,000
Iranian wool carpet
gift
6,000
6,000
Silver service
gift
8,000
8,000
Antique French crystal
purchase
3,000
3,000
Limoges dinner service
purchase
4,500
4,500
Limoges coffee service
purchase
1,500
1,500
Antique Brussels cup
gift
50
50
Limoges soup bowl
gift
150
150
Antique French Petrin oak chest
gift
900
900
Antique bronze lamp set
purchase
400
400
18th Century Chinese silk painting
purchase
13,500
13,500
Max Ernst lithograph
purchase
1,200
1,200
Sculptures & paintings
purchase
2,000
2,000
Herman Toussaint portrait
inherited
-0-
Restored 1930's gas range
purchase
700
700
Archeological library
purchase
4,500
4,500  Total
$ 67,400
*481 Appendix B
Cost or
FMV at
Amount
Item
Acquisition
other basis
loss date
allowed
Philippine rattan furniture
purchase
$ 16,000
$ 8,000
$  8,000
Dining room set
purchase
1,900
1,000
1,000
Three beds
purchase
1,600
800
800
Bedding, etc.
purchase
6,800
1,700
1,700
Refrigerator
purchase
800
100
100
Washer
purchase
700
100
100
Kitchenware
purchase
1,100
500
500
Electric appliances
purchase
4,000
1,000
1,000
Astrakhan fur coat
purchase
2,700
1,500
1,500
Clothing
purchase
11,000
2,000
2,000
Leather coat
purchase
2,200
1,000
1,000 Total
$ 17,700 Appendix A total
$ 67,400  Total allowable deduction
$ 85,100