T.C. Memo. 1997-403


UNITED STATES TAX COURT


MELVIN J. LANEY AND CAROLYN A. LANEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24510-90.                    Filed September 11, 1997.


      Petitioners (Ps) claimed on the Schedule C of
their 1983 tax return a $16.3 million "theft/casualty"
loss.  Ps carried forward this loss as a net operating
loss to their 1986, 1987, and 1988 tax returns.  Ps
contend they are entitled to the claimed deductions,
even if the deductions are not otherwise allowable,
because of a settlement agreement with the Department
of Justice in connection with a suit in the Court of
Claims.  Ps also contend that they had a binding
settlement agreement with the Internal Revenue Service
in the instant case, allowing a net operating loss of
more than $0.5 million.

      1. <u>Held</u>: Ps did not have a settlement agreement
with either the Department of Justice or the Internal
Revenue Service.

      2. <u>Held</u>, <u>further</u>, Ps are not entitled to loss
carryover deductions on account of theft, casualty, or

trade or business; respondent concedes Ps are entitled to capital loss carryover deductions.

3. <u>Held</u>, <u>further</u>, Ps are liable for additions to tax under sec. 6651(a), I.R.C. 1986, for 1987, and under sec. 6653(a), I.R.C. 1986, for 1986, 1987, and 1988.

4. <u>Held</u>, <u>further</u>, Ps are not liable for additions to tax under sec. 6661, I.R.C. 1986, for 1986, 1987, and 1988.

Melvin J. Laney and Carolyn A. Laney, pro sese.

<u>Diane D. Helfgott</u>, <u>Robert Dietz</u>, and <u>Kristine A. Roth</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, <u>Judge</u>:  Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6651(a)[1] (failure to timely file tax returns), 6653(a)(1) (negligence, etc.), and 6661 (substantial understatement of income tax liability) against petitioners as follows:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency[1] | Sec. 6651(a) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a)(1) | Sec. 6661 |
| 1986 | $14,096 | $331 | $705 | [2] | --- | $3,524 |
| 1987 | 9,159 | 2,052 | 458 | [2] | --- | 2,290 |
| 1988 | 8,582 | 429 | --- | --- | $429 | 2,146 |

[1] Of these amounts, $3,070 for 1987 and $3,776 for 1988 are self-employment taxes under ch. 2; the remainders are income taxes under ch. 1.

_____

[1]    Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1986 as in effect for the years in issue.

[2] Fifty percent of the interest due on the entire deficiency.  Some parts of the notice of deficiency that list the additions to tax do not show that respondent determined any additions to tax under sec. 6653(a)(1)B), but Schedules 5, 8, and 14 of the notice of deficiency do show these determinations.  Taking the 20-page notice of deficiency as a whole, and in light of the fact that par. 3 of respondent's answer specifically refers to sec. 6653(a)(1)(B) and that petitioners have not raised any objection to that reference, we conclude that petitioners were not misled by respondent's failure to note the sec. 6653(a)(1)(B) determinations on several pages of the notice of deficiency where one would have expected the determinations to be noted. Accordingly, we hold that respondent made the above-noted sec. 6653(a)(1)(B) determinations in the instant case's notice of deficiency.  Bokum v. Commissioner, 94 T.C. 126, 127 n.2 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); Saint Paul Bottling Co. v Commissioner, 34 T.C. 1137 (1960).

After concessions by respondent[2] and a deemed concession by petitioners,[3] the issues for decision are as follows:

[2]     Among respondent's concessions are the following:

(1) Respondent concedes that petitioners timely filed their 1986 and 1988 tax returns, and thus that petitioners are not liable for the sec. 6651(a) addition to tax for 1986 and 1988.

(2) Respondent concedes that the Rodriguez Key project was a transaction entered into for profit.

(3) Respondent concedes, for purposes of the instant case, that petitioners' 1984 and 1985 tax returns are correct, with the exception of the net operating "theft/casualty" loss carryover deductions claimed thereon.

(4) Respondent concedes that Laney had a 1983 loss from the foreclosure of the Rodriguez Key property and that petitioners may carry this loss forward to 1986 and later years, but contends that the amount available for 1986 is $90,578.21 and that the loss is a capital loss, subject to the limitations of secs. 165(f) and 1211.  The effect of this concession would be to allow petitioners to deduct $3,000 from ordinary income for each of the years in issue.

[3]     Although petitioners dispute the self-employment tax determinations, it appears that this is merely a consequence of their contention that they are entitled to deduct theft/casualty net operating loss carryovers, and not because they otherwise dispute the application of ch. 2.  As infra table 2 shows,

(continued...)

(1) Whether petitioners had a binding settlement agreement entitling them to deduct a net operating loss carryover for the years in issue.

(2) Whether petitioners had a 1983 theft loss, or casualty loss, or trade or business loss that could properly be carried over to the years in issue and, if so, then in what amount.

(3) Whether petitioners are liable for a late filing addition to tax under section 6651(a) for 1987.

(4) Whether petitioners are liable for negligence, etc., additions to tax under section 6653(a)(1) for 1986, 1987, and 1988 and if so for 1986 or 1987, then in what amounts.

(5) Whether petitioners are liable for additions to tax under section 6661 for 1986, 1987, and 1988.

---

[3](...continued) petitioners reported self-employment tax liabilities for each year from 1978 through 1982. However, see sec. 1402(a)(4), which, for purposes of self-employment taxes expressly disallows net operating loss deductions in computing net earnings from self-employment. Apart from the disallowance of the claimed theft/casualty net operating loss deductions, respondent has not made any adjustments to the amounts, categories, or accounting methods that petitioners reported on the Schedules C attached to petitioners' tax returns for the years in issue. Apart from these disallowed deductions, the amounts shown on petitioners' Schedules C would result in a net profit of $24,959 for 1987 and $29,000 for 1988. See infra table 1. As a result, it appears that respondent's determination of self-employment tax liabilities is correct, regardless of our conclusions as to the proper treatment of petitioners' claimed deductions.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners Melvin J. Laney (hereinafter sometimes referred to as Laney) and Carolyn A. Laney resided in Spencerville, Maryland.

Background

Laney has a degree in medicinal chemistry.[4] Laney began to develop an expertise in computer work during the 1950's as a high school student. About 1957 Laney won a national prize for a computer program. Laney also received other awards for his computer skills. After he completed his schooling, Laney frequently was called on to use his expertise in designing computer and information systems both in a university setting and professionally.

From about 1971 through 1974 Laney was the Executive Director of the Society for Computer Medicine. He conducted, or was the keynote speaker of, several national conferences for this organization. He also edited journals in the field of computer medicine.

---

[4] In addition, in December 1970 Laney received a J.D. degree from American University, in the District of Columbia. He noted this on his resume, but he is not admitted to practice in any jurisdiction, and he did not hold himself out as selling his services as a lawyer.

For more than 2 years in the mid-1970's Laney provided consulting services exclusively to the Federal Government.  In this period Laney worked as an expert consultant to the National Institutes of Health (hereinafter sometimes referred to as NIH) to develop a national database for laboratory animals.  Laney obtained national recognition because of his work at NIH.  As a result of the renown and expertise he developed, when Laney left NIH, he was approached by pharmaceutical companies to perform consulting work.  In late 1976 or early 1977 Laney began to do consulting work for the Lederle Laboratories Division of American Cyanamid Co., hereinafter sometimes referred to as Lederle.  By the end of July 1977 this arrangement was formalized in a consulting contract for work in "toxicology computer systems development".

After Laney began to do consulting work for Lederle, he also began to do consulting work for several other pharmaceutical companies, including the following:  Dow Chemical Co., Monsanto Co., Merrill Pharmaceutical Co., and Sterling-Winthrop Research Institute, hereinafter sometimes referred to as Dow, Monsanto, Merrill, and Sterling-Winthrop, respectively.

Laney began his consulting work for Dow in 1979.  Around this time Laney visited divisions of Dow in order to meet with scientists who were involved with the production of animal data, and to view the information systems and procedures of these

scientists.  Laney did this in order to get knowledge to enable him to relate their information systems to the type of information systems that Laney would put into place at the Rodriguez Key project (hereinafter sometimes referred to as R.K.), described infra.  Laney's work with Dow continued into at least 1982.  Laney consulted with Dow about a computerized system for managing animal data in Dow's toxicology studies.  Laney was initially invited to work for Dow because he was working on the information system prototype for R.K.  Laney's initial work for Dow was not related to R.K., but was to help Dow's Health and Safety Division construct its own computer centers that could be designed, programmed, and run independent of Dow's controller's office.  At some point, Laney also consulted with Dow about problems with "Agent Orange".  Eventually Laney advised Dow on how to develop an information system that could communicate with outside sources such as (1) other divisions of Dow located in various places around the world and (2) R.K.  As a result of Laney's work with Dow, Dow built a computer center that was tied into an international communications network; the software that was used in this computer center was consistent with software that Laney designed for Lederle and Sterling-Winthrop.

In or around 1978 Laney began to consult for Monsanto.  Laney was initially invited to work for Monsanto because he was working on the information system prototype for R.K.  Laney

consulted with Monsanto about the development of integrated, centralized, information systems for health and safety testing. The information system that Monsanto developed was consistent with the information system that would be put into place at R.K. Laney's consulting work for Monsanto did not involve Monsanto's sponsorship of research at R.K.

During the time that Laney was working on the information system prototype for R.K., he began his consulting work for Merrill. Laney consulted with Merrill about designs for a centralized and integrated information system. This was consistent with the use of the information system prototype for R.K. Although Merrill expressed an interest in sponsoring research at R.K., this sponsorship never occurred.

Laney did consulting work for Sterling-Winthrop from 1980 to at least 1982. Laney was initially invited to work for Sterling-Winthrop because he had designed the information system prototype for R.K. Laney consulted for Sterling-Winthrop to design a centralized and integrated information system for health and safety testing that could communicate with outside sources, such as (1) Sterling-Winthrop divisions, (2) Sterling-Winthrop contractors, and (3) the information system that would be put into place at R.K. As a result of Laney's work for Sterling-Winthrop, Sterling-Winthrop spent substantial amounts for an information system.

In the early 1970's, Laney created a sole proprietorship known as Melvin J. Laney Associates. On March 19, 1981, Laney incorporated Melvin J. Laney Associates, Inc. These businesses are hereinafter sometimes referred to as the Laney Proprietorship and the Laney Corporation, respectively, and as the Laney Entities, in the aggregate. Laney was the sole owner of each of the Laney Entities. The Laney Corporation's only consulting contract was with Sterling-Winthrop.

Laney did some of his consulting work in his office, which was located in a building on the same property as his residence. Laney also traveled to do consulting work. Laney either was reimbursed for his travel related to his consulting work, or he included these costs in his fees; however, Laney was often housed in a corporate suite or motel room when he traveled. In or around 1980 Laney almost completely stopped doing consulting work that was not related to the information system prototype for R.K.

### The Rodriguez Key Project

#### Overview

In 1977 Laney began to work on R.K. R.K. involved the development of a primate breeding and vaccine testing facility. On June 24, 1978, Laney bought an island, Rodriguez Key (hereinafter sometimes referred to as the Island), in Monroe County, Florida; the Island was to be used as a situs for R.K. Laney bought the Island for a total of $184,442.20 (purchase

price $183,750, closing costs $692.20), with a purchase-money mortgage in the amount of $147,000, a term of 4 years, and an interest rate of 8-1/2 percent. Laney did not make any principal payments on the mortgage, but he made $46,856.25 in interest payments.[5] Laney intended to house 40,000 primates on the Island to be used by pharmaceutical companies to test drugs and for AIDS research.

Laney filed for appropriate permits from the Army Corps of Engineers and a Florida agency. He eventually received the Florida agency permit, but not the Army Corps of Engineers permit. He sued in the United State Court of Claims,[6] which denied both sides' summary judgment motions and remanded the case for trial. In the meanwhile, Laney could not make mortgage

---

[5]     Also, Laney paid at least the following amounts in connection with R.K.: (a) $9,673.14 in property taxes, (b) $24,334.45 in engineering and consulting fees, (c) $28,550.22 in legal fees, (d) $270.50 for permits, and (e) $1,326.74 for services.

[6]     The Federal Courts Improvement Act of 1982, Pub. L. 97-164, 96 Stat. 25, merged the United States Court of Claims into the newly created Court of Appeals for the Federal Circuit and, in effect, reconstituted the trial division of the Court of Claims into a newly created United States Claims Court, a so-called Article I court. More recently, the United States Claims Court was renamed the United States Court of Federal Claims. Federal Courts Administration Act of 1992, Pub. L. 102-572, sec. 902(a)(1), 106 Stat. 4506, 4516. These changes in status and name do not affect the substance of any action for purposes of the instant opinion. In order to avoid the confusions attendant on name and status changes during the course of Laney's damages litigation, we will generally refer to the forum for that litigation as the Court of Claims.

payments, and the Island was sold at foreclosure. Then Laney filed for bankruptcy. Then Laney voluntarily dismissed his Court of Claims petition.

The Property and Lawsuits

The Island was well situated to house a large-scale primate breeding and research facility, because of its (1) subtropic climate, (2) isolation, and (3) biological conditions. R.K., as contemplated by Laney, would have been the largest primate research center of its kind in the world. Laney planned to make a profit from R.K. by renting primate cage space. He also expected to rent housing and other facilities for the people that the pharmaceutical companies would send to the Island to conduct studies. Thus, he worked on a design for hurricane-proof housing for humans. Also, Laney expected to be able to charge the pharmaceutical companies for his consulting services in connection with their studies. He planned to offer the combination of his expertise in computer planning, his scientific background, and his understanding of Federal Drug Administration requirements for approval of drugs. However, he did not intend to require that the companies that rented facilities on the Island use his consulting services.

Laney designed a computer system to control R.K. and the research expected to be conducted in that project. The initial design for this computer system was completed in 1978. The

information systems Laney worked on at Dow, Lederle, Monsanto, Merrill, and Sterling-Winthrop were designed to be able to communicate with the computer system that would be put into place at R.K.

Although much time, effort, and money were spent in the design and planning of R.K., the only improvements ever made to the Island were trails, boardwalks, and some improvements to the landing sites.  R.K. did not become operational, either as a primate facility or as a source of data for computer systems.

Laney ordinarily did not use accountants in connection with his consulting trade or business.  However, around the start of his work on R.K., Laney told an accountant that R.K. was separate from his consulting activities and that he expected to put a lot of money into R.K., and that he wanted advice as to how to account for his R.K. expenditures for tax purposes and for accounting purposes.  The accountant advised him to separately account for expenditures that were investments in R.K., that Laney had a choice of deducting certain expenditures when paid or capitalizing the expenditures and deducting them later, and that it probably was better to capitalize and deduct later.  Laney agreed, and capitalized his R.K. expenditures.  As early as 1977 Laney capitalized his expenditures for rental of certain computer equipment used exclusively for foundation planning for R.K.

When most of Laney's consulting work related to R.K., his practice was to pay himself a "salary", "my typical salary at the time". Petitioners reported these "salary" amounts on their tax returns. See infra table 2 note 1. Petitioners did not report as income the amounts in excess of this "salary" that Laney received for his consulting work related to R.K. In particular, petitioners did not report on their 1977 tax return at least $14,162.73 that Laney had received for consulting work and that he spent on R.K. For the years 1977 through 1982, petitioners omitted to report, in this manner, about $480-490 thousand of Laney's consulting fee receipts.

When Laney asked the accountant for advice on the treatment of expenditures, Laney did not ask for and did not receive advice about the treatment of receipts.

Laney understood from his questioning of the accountant that there would come a time when petitioners could deduct their capitalized R.K. expenditures. However, Laney did not believe that he would ever have to include in income the 1977 through 1982 consulting fees that petitioners had omitted to report when received; petitioners did not include these amounts in income on their 1983 tax return, even though they did report their capitalized R.K. expenses on that tax return.

Laney bought a Data General computer. In 1981 Laney sold it to Sterling-Winthrop and made a profit of about $18,000 on the

sale.  Laney used the $18,000 to pay R.K. expenses.  Petitioners did not report the sale, the $18,000 income therefrom, or the R.K. expenditures on their 1981 tax return.  Petitioners deducted the $18,000 expenditures on their 1983 tax return, but did not report the $18,000 income on their 1983 tax return.

On July 31, 1978,[7] Laney filed a joint permit application with the Army Corps of Engineers and the Florida Department of Environmental Regulations for permits to develop the Island as a primate breeding and vaccine testing facility.  In a "FINAL ACTION" dated October 22, 1979, the Army Corps of Engineers denied Laney's permit application to (1) discharge fill material in navigable waters in order to form a permanent concrete capped pier, and (2) construct a floating pier in navigable waters, both of which Laney believed were necessary in order to develop the Island as a primate breeding and vaccine testing facility.

On March 16, 1980, Laney sued in the Court of Claims, alleging (1) that the action, described supra, of the Army Corps of Engineers denied any access to or use of the Island, and thus (2) that the action constituted a taking for which Laney should be compensated in the amount of $16,347,250.  Laney's counsel in

---

[7]    So stipulated.  The Court of Claims found that the application was filed on July 9, 1978.  Laney v. United States, 228 Ct. Cl. 519, 661 F.2d 145, 146 (1981).  The difference in dates is not material for our purposes.

the Court of Claims case was Thomas C. Henry, hereinafter sometimes referred to as Henry.

On August 19, 1981, the Court of Claims denied Laney's motion for summary judgment and also denied the United States' cross-motion for summary judgment on the takings issue, holding that "Under any view of the law short of these inadmissible extremes there are relevant issues of fact requiring trial." Laney v. United States, 228 Ct. Cl. 519, 661 F.2d 145, 150 (1981). The Court of Claims remanded the case to its trial division for further proceedings.

On October 23, 1981, the Florida Department of Environmental Regulations granted Laney's permit application to develop the Island as a primate breeding and vaccine testing facility.

On May 17, 1983, a Florida court granted a foreclosure sale of the Island to the holder of the mortgage note, Frederick Poppe, hereinafter sometimes referred to as Poppe. The Island was sold for $50,000 to Poppe, and Poppe also received a $75,000 deficiency judgment against Laney. A trial date had not yet been set in his Court of Claims suit, and on December 6, 1983, Laney voluntarily dismissed his Court of Claims petition.

On October 25, 1983, the Laney Corporation filed for relief under chapter 11 of the Bankruptcy Code. On January 6, 1984, this case was converted to a case under chapter 7, on motion of the Laney Corporation. On Mach 20, 1984, Laney, t/a (trading as)

the Laney Proprietorship, filed for relief under chapter 7 of the Bankruptcy Code.  On July 24, 1984, Laney was granted a discharge under chapter 7 which, among other matters, discharged the $75,000 foreclosure deficiency judgment.

On February 25, 1992, Laney filed a motion to reopen the Court of Claims suit that he had previously dismissed.  This motion was denied on June 18, 1992.  Laney v. United States, 26 Cl. Ct. 318 (1992).

### Tax Returns

Petitioners did not attach Schedules C to their tax returns for 1977 through 1982.  See infra table 2 note 1.  On the Schedules C attached to their tax returns for 1983 through 1988, petitioners showed the business name as the Laney Proprietorship and the main business activity as "Consulting & Primate Farm".  Table 1 summarizes information appearing on the Schedules C attached to petitioners' tax returns for 1983 through 1988.

## Table 1

| | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|
| Gross receipts | $564,189.13 | [1] | [1] | [1] | $91,723.54 | $110,448.33 |
| Gross income | 345,282.92 | $9,465.00 | $183.49 | $3,398.00 | 91,723.54 | 110,448.33 |
| Total deductions excluding theft/ casualty loss deduction | 230,449.78 | 15,762.39 | 3,985.52 | 4,942.42 | 66,764.54 | [2] 81,448.28 |
| Net profit(loss) excluding theft/ casualty loss deduction | 114,833.14 | (6,297.39) | (3,802.03) | (1,544.42) | 24,959.00 | [2] 29,000.05 |
| Theft/casualty loss deduction | 16,347,250.00 | 16,194,002.60 | 16,182,867.55 | 16,142,546.20 | 16,072,854.77 | 16,047,895.77 |
| Net profit (loss) | (16,232,416.86) | (16,200,299.99) | (16,186,669.58) | (16,144,090.62) | (16,047,895.77) | [2] (16,018,895.77) |

[1]  Petitioners did not show any amounts on the "Gross receipts or sales" lines of the indicated Schedules C.

[2]  The total of the 1988 Schedule C deductions shown on the tax return is 5 cents less than the amount shown on the "total deductions" line of the 1988 Schedule C.  This 5-cent error does not affect the amount of the "rounded-off" deficiency.

The $564,189.13 amount that petitioners reported as gross receipts on their 1983 tax return represents the amount that Laney believed his clients had spent on R.K., both the actual outlays of his clients and the value of the time of his clients' personnel.  This amount does not include any amounts that Laney's clients paid to him.  The claimed $16,347,250 theft/casualty loss deduction includes some $480-490 thousand that petitioners had omitted from gross income over the period 1977 through 1982 and had spent on R.K.

Petitioners chose not to carry back their claimed 1983 net operating loss, but instead to carry it only forward, and attached statements to this effect to their 1983 and later tax returns.

Table 2 summarizes information appearing on the first and second pages of petitioner's tax returns for 1977 through 1988.

Table 2

| | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|---|---|
| Wages, etc. | $19,841.96 | [1] | [1] | [1] | [1] | [1] |
| Business inc (loss) | -0- | [1] $6,500.00 | [1] $18,150.00 | [1] $26,000.00 | [1]$25,000.00 | [1] $19,032.97 |
| Int., div., tax refund, cap gain inc. | 382.26 | 265.68 | 35.08 | -0- | -0- | 8,726.79 |
| Misc. inc. | -0- | (unexplained) 5,763.29 | -0- | -0- | -0- | -0- |
| AGI | 20,224.22 | 12,528.97 | 18,185.08 | 26,000.00 | 25,000.00 | 27,759.76 |
| Ch. 1 tax (regular income) | 1,023.00 | 24.00 | 394.00 | 1,829.00 | 1,692.00 | 2,162.00 |
| Ch. 2 taxes (self employment) | -0- | 526.50 | 1,458.00 | 2,097.90 | 2,325.00 | 1,779.58 |

[1] Petitioners reported this income on Form 1040, line 8 (wages, etc.), and not line 13 (business income). Also, the retained copy of the tax return did not include a Schedule C or a Schedule SE. However, the amounts of the self-employment taxes shown on petitioners' tax returns for 1978 through 1982 appear to be correct for the amount of income shown.

## Table 2 Cont.

|  | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|
| Wages, etc. | $33,310.59 | -0- | $38,833.30 | $63,710.73 | $14,993.18 | -0- |
| Business inc. (loss) | (16,232,416.86) | ($16,200,299.99) | (16,186,669.58) | (16,144,090.62) | (16,047,895.77) | (16,018,895.77) |
| Int., div., tax refund, cap gain inc. | 5,103.67 | 17,432.44 | 5,290.08 | 7,525.12 | 7,743.67 | 14,770.02 |
| Misc. inc. | -0- | -0- | -0- | -0- | -0- | 27.00 |
| AGI | (16,194,002.60) | (16,182,867.55) | (16,142,546.20) | (16,072,854.77) | (16,025,158.92) | (16,004,098.75) |
| Ch. 1 tax (regular income) | -0- | -0- | -0- | -0- | -0- | -0- |
| Ch. 2 taxes (self employment) | -0- | -0- | -0- | -0- | -0- | -0- |

Petitioners timely filed tax returns for 1986 and 1988. Petitioners timely filed for an automatic extension of time, until August 15, 1988, to file their 1987 tax return. On August 15, 1988, petitioners timely filed a request for a further extension, until May 5, 1989, to file their 1987 tax return. Petitioners were granted an extension only until October 17, 1988. Petitioners filed their 1987 tax return on May 11, 1989. Petitioners did not file their 1987 tax return, or a "first", "initial", or "preliminary" 1987 tax return, before the May 11, 1989, filing referred to supra.

After petitioners filed their petition in the instant case, they dealt with an Appeals officer. After petitioner and the Appeals officer failed to settle the case, petitioners sent a letter to the Secretary of the Treasury, urging him to enter into a section 7121 closing agreement with petitioners. The letter and accompanying materials were referred to the Philadelphia Internal Revenue Service Center. An employee at this Center somehow came to the conclusion that the Appeals Office and petitioner had entered into a binding settlement agreement and thus a section 7121 closing agreement would not be appropriate.

Respondent did not audit petitioners' 1983, 1984, and 1985 tax returns.

On May 5, 1988, the Maryland Tax Court issued an Order and Memorandum of Grounds for Decision in a proceeding involving

petitioners' Maryland income taxes for 1983, 1984, and 1985. In its opinion the Maryland Tax Court concluded that petitioners lost $563,784 in 1983 on account of the foreclosure sale of the Island.

--------

Petitioners did not enter into a binding settlement agreement with the Department of Justice in connection with Laney's Court of Claims suit.

Petitioners and respondent did not have a binding settlement agreement in the instant case, nor did they enter into a section 7121 agreement with respect to the instant case or any issue therein.

The Army Corp of Engineers did not criminally appropriate the Island or any other asset connected with R.K. Poppe did not criminally appropriate the Island or any other asset connected with R.K.

R.K. was not part of Laney's trade or business of offering his services as a consultant. R.K. had not gone into operation before Laney suffered his losses and was forced to give up the Island and the entire project.

Petitioners did not use due care in claiming the $16.3 million theft and casualty loss with a 15-year net operating loss carryforward; and they failed to do what a reasonable and ordinarily prudent person would do under the circumstances.

Petitioners' failure to file their 1987 income tax return until May 11, 1989, was not due to reasonable cause.

Petitioners substantially understated their income tax liabilities for 1986, 1987, and 1988; however, they adequately disclosed in a statement attached to their tax returns the relevant facts affecting the tax treatment of their claimed net operating loss carryforward.

## OPINION

Every matter that we are to resolve in the instant case stems directly from, or is substantially affected by, R.K.

### I. Settlement

#### A. With Justice Department

Petitioners argue that they are entitled to a 1983 theft/casualty loss deduction with a 15-year net operating loss carryover because Laney had an agreement with the Department of Justice that he is entitled to deduct this net operating loss carryover in exchange for voluntarily dismissing the Court of Claims petition in which he alleged a taking of R.K. by the United States.

Respondent contends that petitioners did not have an agreement with the Department of Justice.

We agree with respondent.

In their pretrial memorandum, the first witness petitioners listed was Henry, who was expected to testify about "the

settlement agreement [in Laney's Court of Claims suit] forced by the United States on Petitioner to take a theft/casualty loss on their tax returns." At trial, Laney stated petitioners' intention to have Henry testify. On the third day of the trial Laney stated that Henry was to testify on the fifth day of the trial. On the fourth day of the trial Laney again assured us that Henry was to appear and testify on the fifth day. Henry did not testify on the fifth day. As one of the first items of business on the sixth day, the Court noted the importance of Henry's testimony on the negligence issue, as part of an effort to make sure that both sides understood the Court's concerns about apparently missing pieces of the puzzle presented in the instant case. The trial lasted 7 days.

In the final analysis, petitioners chose not to call Henry, and he did not testify. We are entitled to, and we do, infer that if Henry had testified, then his testimony would have been unfavorable to petitioners on this issue. O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959), affg. 28 T.C. 698, 703 (1957); Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court dated March 13, 1953; Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

We observed Laney at the trial in the instant case. On the basis of these observations and the evidence of record, it is

obvious that Laney is intelligent, perceptive, cautious, and self-protective to a fault.  He generally refused to concede anything he thought might be to his disadvantage, no matter how clear the matter was.  We are convinced that, if Laney understood that the Department of Justice conceded his entitlement to a $16.3 million deduction in exchange for his dropping his Court of Claims suit, then (1) Laney would not have proceeded to drop that suit unless he had the Department of Justice's concessions in writing, (2) Laney would have preserved this writing, and (3) Laney would have produced this writing for the record in the instant case.  Petitioners did not present any such written settlement agreement or any evidence that there ever was a written settlement agreement.  From the foregoing we infer that (1) there was not a written settlement agreement, and (2) there was no oral concession by the Department of Justice that Laney would be entitled to the claimed deduction in consideration for dropping his Court of Claims suit.

On the first day of the trial petitioners offered into evidence an affidavit by Henry.  Laney explained that the affidavit was offered as an expert witness report.  The Court indicated doubt that the affidavit would so qualify but noted that ordinarily an expert witness report "is admissible if it is identified [and adopted] by the expert at the trial and the expert is made available for cross examination."  The Court

suggested that, if Laney wanted to offer the affidavit as an expert witness report, then the time to do so was when Henry appeared as a witness, as we had been informed would be the situation. In the absence of agreement by respondent, the Court declined to receive the affidavit into evidence on the first day of the trial.

Before the trial in the instant case, Laney had sought to reopen his prior Court of Claims case. In support of his motion before the Court of Claims (see supra note 6), Laney presented what appears to be the same Henry affidavit that petitioners offered into evidence in the instant case.[8] We note that, in the opinion denying Laney's motion to reopen, the chief judge of that court quoted from the affidavit and concluded that the Department of Justice attorney did not make a settlement offer and further "[concluded] that no settlement agreement was ever consummated." Laney v. United States, 26 Cl. Ct. 318, 322, 323 (1992).

On the record in the instant case, we conclude, and we have found, that petitioners did not enter into a binding settlement

---

[8] Compare Rule 143(b), that ex parte affidavits are not evidence, with, e.g., Rule 121 to illustrate proper use of affidavits in certain aspects of motion practice before this Court. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

agreement with the Department of Justice in connection with Laney's Court of Claims suit.[9]

We hold for respondent on this issue.

B. With Respondent

Petitioners argued at trial that they had entered into a binding settlement agreement with respondent for the years in issue. Petitioners explained that they believed perhaps respondent had settled their case without their knowledge.

Respondent contends that the parties in the instant case did not enter into a binding settlement agreement.

We agree with respondent.

Petitioners were aware that they did not have a binding settlement agreement with the Appeals officer. Petitioners' letter to the Secretary of Treasury illustrates that, when they wrote that letter, petitioners did not believe that they had a binding settlement agreement with respondent.

Petitioners rely on documents in which one or more of respondent's employees refer to binding settlement agreements. Testimony was presented by respondent's employees as to how it came to be that respondent advised the Secretary of the Treasury that the Secretary could not enter into a closing agreement under

---

[9] Thus it is not necessary to decide whether, if the Justice Department had made an agreement with petitioners, that agreement would be binding on respondent. See Graff v. Commissioner, 74 T.C. 743 (1980), affd. 673 F.2d 784 (5th Cir. 1982).

section 7121 because there was a binding settlement agreement in the instant case.  We did not come away from this part of the case with the belief that we understand substantially everything that happened.  We do not understand how it came to be that petitioners' letter to the Secretary of the Treasury elicited the response that there  was a binding settlement agreement.

We have recently discussed the nature of, and requirements for, binding settlement agreements.  <u>Dorchester Industries, Inc. v. Commissioner</u>, 108 T.C. 320 (1997).  We have reexamined the record in the instant case; we conclude, and we have found, that petitioners and respondent did not have a binding settlement agreement, nor did they enter into a section 7121 agreement with respect to the instant case or any issue therein.

Respondent's significant concessions, whether by stipulation or unilateral, are limited as described <u>supra</u> note 2.  Those concessions will be given effect in the Rule 155 computation, but do not have the far-reaching effect that petitioners seek.

Because we conclude that there was not a settlement agreement in the instant case, we do not need to consider, and we do not consider, whether any individuals with whom petitioners dealt had authority to enter into settlement agreements on behalf of respondent.

We hold for respondent on this issue.

## II. Carryover Deductions

The years in issue in the instant case are 1986, 1987, and 1988. The deficiencies that respondent determined in the instant case result from the disallowance of deductions carried over from 1983. In order to redetermine these deficiencies we must consider whether an item arose in 1983, whether the item is of the sort that might give rise to a carryover to the years in issue, and if so, then what is the nature and amount of the item. Sec. 6214(b);[10] Hill v. Commissioner, 95 T.C. 437, 439-444 (1990), and cases cited therein. In general, the nature and amount of the carryover item is determined and redetermined under the law in effect for the year in which the carryover item arose (1983), rather than the year(s) to which the carryover item is carried. Sec. 172(e).

---

[10] Sec. 6214 provides, in pertinent part, as follows:

SEC. 6214. DETERMINATIONS BY TAX COURT.

* * * * * * *

(b) Jurisdiction Over Other Years and Quarters.--The Tax Court in redetermining a deficiency of income tax for any taxable year or of gift tax for any calendar year or calendar quarter shall consider such facts with relation to the taxes for other years or calendar quarters as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year or calendar quarter has been overpaid or underpaid.

Petitioners contend that they suffered a "theft/casualty" loss in 1983 in the amount of $16,347,250, which is treated in effect as a business loss for net operating loss deduction purposes.[11]  See 172(d)(4)(C).  Their deduction of this item on the Schedule C attached to their 1983 tax return resulted in a net loss in the amount of $16,232,416.86.  They contend that they properly elected to waive the carrybacks (sec. 172(b)(3)) and instead claim to be entitled to carry this loss forward for 15 years including the years in issue as a net operating loss (sec. 172(b)(1)(A)(ii)).

Respondent contends that (1) petitioners' loss was much less than petitioners claim, (2) the loss was not from a theft or

---

[11]     Petitioners' original claim, and the expert witness evidence they presented at trial, go to the expected value of the enterprise that was expected to arise from R.K.  Petitioners initially overlooked the effect of sec. 165(b), as follows:

SEC. 165.  LOSSES.

    *     *     *     *     *     *     *

(b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

At one point in their answering brief petitioners contend that their basis in the property involved in R.K. was "at least $563,784", but for the most part they still contend that they are entitled to deduct $16,347,250 for 1983 and to carry over to the years in issue the amounts shown on their tax returns for these years.  See supra table 1.

casualty, and (3) R.K. was not a trade or business, so petitioners did not have a net operating loss, and so petitioners are not entitled to net operating loss carryover deductions for the years in issue. Respondent concedes that (1) petitioners had a loss from R.K., (2) R.K. was a transaction entered into for profit, and (3) petitioners are entitled to capital loss carryover deductions for the years in issue. Because petitioners did not have any capital gains for the years in issue, the capital loss carryover deductions are only $3,000 per year. For 1986, see sec. 1211(b)(2)(B). For 1987 and 1988, see sec. 1211(b)(1).

We agree with respondent.

Losses are deductible under section 165.[12]  Individuals are not permitted to deduct losses unless the losses are (1) incurred

---

[12]    Sec. 165, as in effect for 1983, provides, in pertinent part, as follows:

SEC. 165.  LOSSES.

(a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

* * * * * * *

(c) Limitations on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to--

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) except as provided in subsection (h) [relating to presidentially proclaimed disasters], losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

* * * * * * *

(e) Theft Losses.--for purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

Although the years in issue are 1986, 1987, and 1988, we use the statute as in effect for 1983 because that is the year for which the loss was claimed and from which the loss was carried forward.  The later amendment of subsec. (c)(3), by sec. 711(c)(2)(A)(i) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 943, does not affect the instant case.

in a trade or business, or (2) incurred in a transaction entered into for profit, or (3) arise from a casualty or a theft.  Sec. 165(c).

Laney began to work on R.K. in 1977.  He bought the Island in 1978, and applied for permits to develop the Island and make it accessible.  The Army Corps of Engineers turned him down in 1979.  Laney sued in the Court of Claims in 1980.  The Court of Claims denied both sides' summary judgment motions in 1981, and the case was returned to the trial division of the Court of Claims.  Laney failed to make the principal payment on his purchase-money mortgage, and Poppe, the then holder of the mortgage note, foreclosed; the Florida court granted foreclosure in 1983.  Later in 1983 the Laney Corporation filed a chapter 11 bankruptcy petition.  In 1984 this was converted to a chapter 7 proceeding; then Laney trading as the Laney Proprietorship filed under chapter 7; then Laney was granted a discharge under chapter 7.

A. Loss From Theft

In order to be treated as a theft loss under section 165, the loss must arise from a criminal appropriation of the taxpayer's property.  Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956); Horn v. Commissioner, 90 T.C. 908, 940 (1988); Nichols v. Commissioner, 43 T.C. 842, 884 (1965).  A seizure of property by a government under color of legal authority is not a

theft, whether or not the government conduct is arbitrary or despotic.  Farcasanu v. Commissioner, 436 F.2d 146, 149 (D.C. Cir. 1970), affg. 50 T.C. 881 (1968); Powers v. Commissioner, 36 T.C. 1191, 1192 (1961).  As to foreclosures and repossessions, see Johnson v. United States, 291 F.2d 908, 909 (8th Cir. 1961); Rafter v. Commissioner, 60 T.C. 1, 13 (1973), affd. without published opinion 489 F.2d 752 (2d Cir. 1974).

Whether or not the Army Corps of Engineers acted within its lawful authority,[13] we conclude, and we have found, that the Army Corps of Engineers did not criminally appropriate the Island or any other asset connected with R.K.

We conclude, and we have found, that Poppe's actions in successfully enforcing his rights under the purchase-money mortgage note did not constitute a criminal appropriation of the Island or any other asset connected with R.K.  Johnson v. United States, 291 F.2d at 909.

Petitioners point out that respondent did not dispute their 1983, 1984, and 1985 theft/casualty loss deductions and carryovers.  As supra table 1 shows, petitioners reported a substantial profit for 1983, but for this deduction.  Also, petitioners reported other income for 1984, and wage and other income for 1985 (see supra table 2), in amounts substantially

---

[13]   See Laney v. United States, 661 F.2d at 147-149, holding that the Army Corps of Engineers misinterpreted the law.

greater than the losses that petitioners reported for these years, but for their theft/casualty deductions. Thus, it appears that petitioners would have had tax liabilities for 1983, 1984, and 1985 if respondent had disallowed the claimed theft/casualty deductions. We do not know why respondent failed to audit petitioners' tax returns for these years. Respondent's failure to timely audit petitioners' 1983, 1984, and 1985 tax returns may have resulted in petitioners' obtaining a windfall for those years, but it does not estop respondent from auditing petitioners for 1986, 1987, and 1988 on the theft/casualty loss deduction carryover issue and determining deficiencies for these years on this issue. Thomas v. Commissioner, 92 T.C. 206, 225-227 (1989), and cases there cited.

We hold, for respondent, that Laney's claimed 1983 loss did not arise from theft.

B. Loss From Casualty

A loss must arise from fire, storm, shipwreck, or "other casualty" in order to be treated as a casualty loss under section 165. Sec. 165(c)(3). Clearly, Laney's R.K. loss did not arise from a fire, a storm, or a shipwreck. Generally, in order for a loss to arise from an "other casualty" (1) the event causing the loss must be sudden, undesigned, violent or forceful, unexpected, and accidental, and (2) the direct and proximate damage from the event must cause a loss that is similar to losses arising from

fires, storms, and shipwrecks.  Popa v. Commissioner, 73 T.C.
130, 132-133 (1979); White v. Commissioner, 48 T.C. 430, 434-435
(1967); Durden v. Commissioner, 3 T.C. 1, 3-4 (1944).  As we put
it in Billman v. Commissioner, 73 T.C. 139, 141-142 (1979)--

> We cannot believe that the Internal Revenue Code
> was designed to take care of all losses that the
> economic world may bestow on its inhabitants.  It is
> restricted in its description of a casualty loss to
> "losses aris[ing] from fire, storm, shipwreck, or other
> casualty, or from theft."  Certainly these taxpayers
> did not suffer from "fire, storm, [or] shipwreck." Of
> course they suffered.  But, was it from "other
> casualty?"  To us, "other casualty" means a similar
> kind of occurrence to "fire, storm, [or] shipwreck."
> * * *

Firstly, Poppe's successful foreclosure proceeding is not
the type of event that is sudden, undesigned, violent or
forceful, unexpected, and accidental.  Secondly, even assuming
that petitioners lost all value of the Island and R.K. on account
of the Army Corps of Engineers' action of denying permits to
develop the Island, that denial is not the type of event that is
sudden, undesigned, violent or forceful, unexpected, and
accidental.  Thus, Laney's loss was not from an "other casualty".
Powers v. Commissioner, 36 T.C. at 1193; see Beltran v. United
States, 441 F.2d 954, 960 (7th Cir. 1971); Alvarez v. United
States, 431 F.2d 1261, 1264 (5th Cir. 1970).

We hold, for respondent, that Laney's claimed 1983 loss did
not arise from fire, storm, shipwreck, or other casualty.

## C. Loss From Trade or Business

As a result of subsections (c) and (d) of section 172, the basic category of an individual's losses that may constitute net operating losses is losses from the conduct of a trade or business. In general, expenditures paid or incurred in preparing to enter a trade or business must be capitalized, even if those expenditures are of a sort that ordinarily would be currently deductible if the taxpayer had already entered the trade or business. Hardy v. Commissioner, 93 T.C. 684, 687 (1989), affd. on this issue and remanded to consider a new issue per order (10th Cir., Oct. 29, 1990).

Because we conclude, for reasons described infra, that (1) R.K. was not a part of Laney's then-ongoing consulting trade or business, and (2) R.K. had not yet gone into operation when Laney suffered his losses therefrom, petitioners are not permitted to carry over Laney's R.K. losses as a net operating loss to the years in issue.

Whether a transaction is an expansion of an existing business, or creates a new and distinct trade or business depends on the facts and circumstances. In First Security Bank of Idaho, N.A. v. Commissioner, 63 T.C. 644 (1975), affd. 592 F.2d 1050 (9th Cir. 1979), this Court concluded that when First Security Bank of Idaho and First Security Bank of Utah initiated consumer credit card plans, the initial expenses were expenses of

expanding their already existing commercial banking activities, and not preopening expenses of new businesses. On the other hand in Hardy v. Commissioner, supra, this Court concluded that the taxpayer's intent to buy and thereafter to own and manage large commercial hotel and motel properties was unrelated to the taxpayer's part-time work managing rental homes.

We believe that the situation in the instant case is more like a rental real estate manager beginning a new business as a manager and owner of hotels and motels, than it is like commercial banks expanding into the credit card industry. Laney worked as a computer programming consultant. In or around 1977 Laney began to do computer consulting for several pharmaceutical companies. Laney designed integrated computer systems for these companies that could communicate with other computer systems. His work for these companies was performed either at their facilities or at his home office. Laney's consulting work consisted of providing a service; it did not include rental of space or ownership of real property. In the case of R.K., however, Laney's plan was to profit from the rental of cage space. He expected to offer his consulting services to the R.K. researching entities, but none of those entities would be required to use his consulting services.

Petitioners called Clement C. Darrow II (hereinafter sometimes referred to as Darrow), as an expert witness, both to

show the legitimacy of R.K. and to provide Darrow's opinion as to the value of R.K., if that project had not been cut off in its infancy. Darrow had been director of a primate center for Litton Bionetics under contract to NIH in 1978, when he was approached by American Cyanamid Co. (hereinafter sometimes referred to as American Cyanamid) to review plans for R.K. In August 1978, Darrow began to work for American Cyanamid. He was hired to direct American Cyanamid's primate breeding and research work that was planned to be carried out on the Island. He continued to work for American Cyanamid in this role until March 1982. The Court was satisfied that Darrow's prior experience in responsible positions in creating or supervising primate research operations, and his lengthy involvement in R.K. planning as an American Cyanamid employee, qualified him as an expert witness in the offered matters. Darrow valued R.K. at $19,200,000, entirely on the basis of an analysis of the cage fees that Laney was likely to receive from the operations of R.K. To us, Darrow's analysis emphasizes the substantial differences between R.K. and Laney's established trade or business as a consultant.

Also, Laney kept separate books and records for his consulting services expenditures and his R.K. expenditures; he generally deducted his consulting services expenditures currently but capitalized his R.K. expenditures. Laney testified that he

regarded R.K. as "a separate entity" for tax and accounting purposes.

We conclude, and we have found, that R.K. was not part of Laney's trade or business of offering his services as a consultant.

Because R.K. had not yet gone into operation when Laney suffered his reverses and, in 1983, his loss in connection therewith, Laney's 1983 R.K. loss was not a loss attributable to a trade or business, and so could not enter into the computation of a net operating loss. Sec. 172(d)(4); Todd v. Commissioner, 77 T.C. 246 (1981), affd. 682 F.2d 207 (9th Cir. 1982).

We hold, for respondent, that Laney's claimed 1983 loss did not arise from a trade or business.

D. Nature and Amount of Loss

Respondent concedes that R.K. was a transaction entered into for profit, within the meaning of section 165(c)(2). We have held that Laney's 1983 R.K. loss could not be carried forward as a theft loss, a casualty loss, or a trade or business loss. Petitioners have not suggested, and we have not found, any other ordinary loss that could be carried from 1983 to the years before the Court.[14]

---

[14] Neither side discusses sec. 195, relating to deductibility of startup expenditures. Laney's testimony about his pre-1983 notions of proper accounting procedures, his promises to clarify matters later in the trial, and his brief
(continued...)

Respondent concedes that Laney suffered a capital loss that, under section 165(f), could be deducted and carried over within the limits of sections 1211 and 1212.  Respondent further concedes that "the amount of loss available for carryforward as of 1986 is $90,578.21".  Petitioners have not reported any capital gains or losses for 1986, 1987, or 1988.  Under section 1211(b)(1), petitioners are entitled to deduct against ordinary income up to $3,000 of this capital loss carryover for each of the years before the Court.

It is evident that respondent's concession exceeds the maximum amount that petitioners could deduct for the entire period before us.  Accordingly, even if we were to conclude that petitioners are entitled to carry over a greater amount of loss than respondent has conceded, any such conclusion could not result in any greater deduction by petitioners for any of the years in issue, and so any such conclusion could not affect the decision to be entered in the instant case.

As a result, we decline to determine in the instant case whether petitioners are entitled to a greater capital loss carryover than respondent has conceded.  Chevron Corp. v.

---

[14](...continued)
explanations of only a small portion of his 1,300-plus exhibits, do not leave us in a position to determine on the record in the instant case whether petitioners would be entitled to deductions under sec. 195 that would affect any of the years in issue.

Commissioner, 98 T.C. 590 (1992); LTV Corp. v. Commissioner, 64 T.C. 589 (1975).

We hold that petitioners are entitled to deduct $3,000 against ordinary income for each of the years before us, on account of their capital loss carryover to these years.

### III. Additions to Tax

#### A. Section 6651(a)(1)

Section 6651(a)(1)[15] imposes an addition to tax of 5 percent per month (with a maximum of 25 percent) in case of failure to file a timely income tax return, unless it is shown that this failure is due to reasonable cause and not due to willful neglect. Petitioners have the burden of proving error in respondent's determination that this addition to tax should be

---

[15] Sec. 6651(a) provides, in pertinent part, as follows:

SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) Addition to the Tax.--In case of failure--

(1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

imposed against them.  Funk v. Commissioner, 687 F.2d 264, 266 (8th Cir. 1982), affg T.C. Memo. 1981-506; Ehrlich v. Commissioner, 31 T.C. 536, 540 (1958).

Respondent concedes that petitioners timely filed their 1986 and 1988 tax returns.  See supra note 2.

Petitioners received an automatic extension of time, until August 15, 1988, to file their 1987 tax return.  They timely filed a request for a further extension, until May 5, 1989; they were granted an extension only until October 17, 1988.  They filed their 1987 tax return on May 11, 1989, almost 7 months late.

At trial and on brief petitioners contend that they filed a 1987 "first return", or "initial return", on August 15, 1988, together with their request for a further extension. Respondent's records show both extensions, but do not show any 1987 tax return for petitioners filed before May 11, 1989.  We note that petitioners' August 15, 1988, request for further extension states the following as the last sentence of their explanation of why they need the further extension:  "Tax Payer will be due a refund of $953.08 when the Federal return is filed and owes no tax."  (Emphasis added.)  This language strongly suggests that the request for further extension was not accompanied by any tax return for 1987.

When this contention by petitioners first became apparent to the Court, on the morning of the sixth day of trial, the following colloquy occurred:

 THE COURT: And all this time you have not provided for the Court, and I gather not provided for respondent, a copy of the document that you are now telling us was your tax return for 1987.

 THE WITNESS [Laney]: I discussed it at audit. I discussed it with appeals. I have contended that we did file on time and I have mentioned the fact that we also asked for an extension and that a second return was filed and petitioners have been consistent in that position, Your Honor.

 THE COURT: Mr. Laney, I had understood until now that when you said that you contended that your tax return was filed on time you were contending that you had received extensions until May 5, 1989, and so the question is whether or not you had indeed received such an extension. But now, if I understand correctly, you are telling us no, that's not the deadline that is applicable here and that is not the tax return that is applicable here; the relevant deadline was August 15, 1988, and you satisfied that August 15, 1988, deadline by mailing a tax return on August 15, 1988.

 THE WITNESS: Yes, Your Honor. When the trial began for this day and we were discussing penalties petitioner said that he had a certified mail receipt for the fact that he had filed his return on time and that it was dated August 15, 1988.

 THE COURT: But the only stipulated document as the tax return was Exhibit 2-B, which clearly showed your signature and Mrs. Laney's signature of May 1989, which was a flat out contradiction to your position.

 THE WITNESS: But we still stated at that time that we had filed a return on August 15th. We've never varied from that. We also took extensive precautions in case that return was in error to provide us with the ability to file a second return without paying a penalty for having the refund if we did not deserve it.

THE COURT:  When, if at all, did you intend to provide the Court with a copy of the return you claimed to have filed on August 15, 1988?

THE WITNESS:  Your Honor, I will go to my records and make a copy of that and bring that in tomorrow.  I apologize for the confusion.  When we were audited and that copy was first produced for the convenience of the auditor and then apparently passed in the administrative file and on up, it now appears that we should have provided a copy of the initial filing.  We apologize for not doing that.

Petitioners were given an opportunity to produce any retained copy, or other evidence, of an earlier filed 1987 tax return. They did not produce any such evidence.

We do not believe Laney's testimony that petitioners sent to respondent a tax return for their 1987 liability together with their August 15, 1988, request for further extension.  We do not believe that petitioners sent to respondent any tax return for their 1987 liability before they sent the tax return with the May 5, 1989, signature dates, which respondent filed on May 11, 1989. We have so found.

Thus, petitioners' tax return was filed almost 7 months after the October 17, 1988, extended due date.  Under section 6651(a)(1), this results in an addition to tax of 25 percent of the amount of petitioners' tax liability, "unless it is shown that such failure [to file timely] is due to reasonable cause and not due to willful neglect".

Petitioners contend, and Laney testified, that they received from respondent a notice that their August 15, 1988, request for further extension was granted for "maximum time allowed", and

this was stated to be until May 5, 1989.  The only documentary evidence that petitioners presented on this point is a letter attached to their 1987 tax return, as follows (emphasis in original):

Melvin J. & Carolyn A. Laney<br>
1515 Spencerville Rd.<br>
Spencerville, Md. 20868

November 9, 1988

Director
Internal Revenue Service
Philadelphia, Pa. 19255

Dear Director:

   Re:  Verification of <u>Special Extension</u> to File 1987
        Return for Account # 215 38 2691

   On August 15, 1988 we filed Form 2688 <u>plus</u> a special request to file our 1987 return by May 5, 1989.  As part of our special request we enclosed a copy of our May 5, 1988 Md. Tax Court opinion ruling in our favor.  The Md. Comptroller had taken no action on this ruling and we requested a special extension.  Yesterday we received a notice from your office granting our request for "Maximum time allowed".

   Today we called 488-3100 and spoke with a Mr. Hill in the Problem Resolution Office and then with a Mr. Wilson of the Accounts Office.  Mr. Wilson assured us that we could assume the words "Maximum time allowed" applied to our special request and not to the standard Form 2688 extension time.  The time period for Form 2688 expired last month.

   We are writing this letter to <u>verify approval of our special request</u> based on the Maryland Tax Court opinion previously enclosed.  The final resolution of this case will effect how our Federal Income Tax/Md. return is completed. We will <u>owe no federal tax</u> and <u>will receive a refund</u> for 1987.

Sincerely,<br>
Melvin J. Laney

Respondent's records show that, on August 22, 1988, it was posted that petitioners' request for further extension was granted until October 17, 1988.

In evaluating the evidence we note the following:

(1) Petitioners appear to have made up their story about a 1987 tax return filed on or about August 15, 1988.

(2) Petitioners have kept extensive tax-related records dating back to 1977 but have not produced the notice they received from respondent so that we could view the language described in petitioners' November 9, 1988, letter.

(3) Petitioners have not described with particularity what they asked of respondent's employees in the telephone call described in petitioners' November 9, 1988, letter.

Petitioners have to persuade us that it is more likely than not that respondent's employees advised petitioners that petitioners had until May 5, 1989, to file their 1987 tax return, that petitioners in fact relied on this advice, and that it was reasonable for petitioners to rely on this advice.

We doubt the correctness of petitioners' story; we doubt that respondent's employees really advised petitioners that the

due date of petitioners' 1987 tax return was extended to May 5, 1989; and in light of our lack of information as to the foregoing we cannot conclude that petitioners acted reasonably in delaying the filing of their 1987 tax return.[16]

We hold, for respondent, that petitioners filed their 1987 tax return more than 6 months late, and that petitioners have not shown that their failure to file timely was due to reasonable cause.

B. Section 6653(a)(1)

In the notice of deficiency respondent determined, and on brief respondent contends, that petitioners were negligent in claiming the theft/casualty loss deduction. At trial Laney testified, and on brief petitioners contend, that they relied on the advice of Henry, their lawyer, in claiming this deduction.

We agree with respondent.

---

[16] For example, it may be that respondent's employees merely advised petitioners that, if petitioner in fact did not have a tax liability (or no tax liability in excess of their $953.08 of withholding), then petitioners would not be liable for an addition to tax under sec. 6651(a)(1). As we have held on other occasions, that advice would not protect petitioners in the instant case, because they do have a 1987 tax liability in excess of their withholding. E.g., Beales v. Commissioner, T.C. Memo. 1992-608; Morgan v. Commissioner, T.C. Memo. 1984-384, affd. 807 F.2d 81 (6th Cir. 1986); Wilkinson v. Commissioner, T.C. Memo. 1982-429; see also Patronik-Holder v. Commissioner, 100 T.C. 374, 379-381 (1993); Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 133-134 (1962), affd. in part and revd. in part 324 F.2d 633, 646 (8th Cir. 1963).

Section 6653(a)(1)(A)[17] (sec. 6653(a)(1), as to 1988)

imposes an addition to tax of 5 percent of the underpayment if

---

[17]     Sec. 6653(a), as in effect for 1986 and 1987, provides, in pertinent part, as follows:

SEC.  6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD.

(a) Negligence.--

(1) In general.--If any part of any underpayment * * * is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of--

(A) 5 percent of the underpayment, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

Sec. 6653(a), as in effect for 1988, provides, in pertinent part, as follows:

SEC. 6653.  ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD.

(a) Negligence.--

(1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to negligence (or disregard of rules or regulations), there shall be added to the tax an amount equal to 5 percent of the underpayment.

The later amendment of this provision by sec. 7721(c)(1) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, does not affect the instant case. The substance of this provision now appears in subsecs. (b)(1) and (c) of sec. 6662.

any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) imposes an additional addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to the negligence, etc. Petitioners have the burden of proving error in respondent's determination that these additions to tax should be imposed against them. Korshin v. Commissioner, 91 F.3d 670, 671 (4th Cir. 1996), affg. T.C. Memo. 1995-46; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Broadly speaking, for purposes of this provision, negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Cluck v. Commissioner, 105 T.C. 324, 339 (1995); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Reasonable and good-faith reliance by a taxpayer on an accountant or attorney may be sufficient to avoid the addition to tax for negligence. See United States v. Boyle, 469 U.S. 241, 251 (1985).

The $16 million-plus deduction that petitioners took on their 1983 tax return and carried over to each of their tax returns through at least 1988, was many times as great as any other items on their tax returns from 1977 on. See supra tables 1 and 2. From 1983 on, these deductions took petitioners off the

Federal tax rolls as to both the regular income tax and, they contended, the self-employment taxes.  See supra table 2. Clearly, the ordinarily prudent taxpayer would consult with a qualified tax adviser before claiming a deduction of such relative size and consequence.

Petitioners claim that they did just that--they consulted with Henry and they acted on Henry's advice.  However, petitioners did not tell us exactly what Henry's advice was, nor did they provide us with information from which we could conclude that it was reasonable for them to rely on Henry's advice. Finally, as discussed supra (I. Settlement A. With Justice Department), petitioners promised that we would have Henry's testimony, but then did not call Henry.  As discussed supra in Part I.A., we are entitled to, and we do, infer that if Henry had testified, then his testimony would have been unfavorable to petitioners on this issue.  O'Dwyer v. Commissioner, 266 F.2d at 584; Stoumen v. Commissioner, 208 F.2d at 907; Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165.

Also apart from the effect of the Wichita Terminal doctrine, when taxpayers rely on the claim that they are not negligent because they merely followed competent professional advice, it is particularly important that they present their adviser, that they show with some precision what their adviser advised them to do,

and that they show that they followed that advice. <u>Zfass v. Commissioner</u>, 118 F.3d 184 (4th Cir. 1997), affg. T.C. Memo. 1996-167. Petitioners failed on all these counts in the instant case. We do not credit petitioners' contention that they relied on Henry's advice.

Petitioners point out that respondent did not dispute their 1983, 1984, and 1985 theft/casualty deductions and carryovers. Respondent's failure to audit merely results in an apparent windfall to petitioners; it does not relieve petitioners from their obligation to act prudently and obtain advice from competent tax counsel.[18]

We conclude, and we have found, that petitioners were negligent in claiming the theft/casualty carryover deductions for each of the years in issue.

For each of the years in issue the entire deficiency in tax is due to petitioners' negligence in claiming the theft/casualty carryover deduction. For each of the years in issue the deficiency is equal to the "underpayment of tax", which is the

_____

[18] We have held that, under some circumstances, an audit for an earlier year and a concession by the Commissioner that the corresponding deduction for the earlier year was correct, might relieve a taxpayer from the obligation to thereafter obtain advice from competent tax counsel. See, e.g., <u>Bermingham v. Commissioner</u>, T.C. Memo. 1994-69; see also <u>Washburn v. Commissioner</u>, 44 T.C. 217, 225-226 (1965). There was no such audit in the instant case, and no apparent approval by respondent as to the claimed theft/casualty loss deductions.

base for the negligence additions to tax. Sec. 6653(c), now to be found in sec. 6664(a).

Consequently, we hold, for respondent, that for each of the years in issue[19] the entire underpayment of tax is due to petitioners' negligence.

C. Section 6661(a)

Section 6661(a)[20] imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. Cochrane v. Commissioner, 107 T.C. 18, 29 (1996); Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $5,000. Sec. 6661(b)(1)(A). (Our

---

[19] See Emmons v. Commissioner, 92 T.C. 342, 347-351 (1989), affd. 898 F.2d 50 (5th Cir. 1990), as to the effect that the late filing of petitioners' 1987 tax return would have on the negligence addition for 1987. We have not engaged in an Emmons-type analysis in the instant case because the parties did not present the point, and such an analysis would not affect the conclusions we reached on different grounds.

[20] SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY.

(a) Addition to Tax.--If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement.

Sec. 6661 was repealed by sec. 7721(c)(2) of OBRA 89, 103 Stat. 2399. The substance of former sec. 6661 now appears as secs. 6662(b)(2), 6662(d), and 6664(c)(1).

holdings make it clear that petitioners have substantial understatements for 1986, 1987, and 1988.)

If an item is not attributable to a tax shelter, then the understatement shall be reduced on account of the item, and the addition to tax accordingly reduced, if (1) the taxpayer's treatment of the item was based on substantial authority, or (2) the taxpayer adequately disclosed on the tax return or in a statement attached to the tax return the relevant facts affecting the item's tax treatment.  Sec. 6661(b)(2)(B).

Petitioners were not involved with a tax shelter, and they attached a note to their tax returns explaining that the carryover loss they claimed originated from a 1983 net operating loss from business property seized by the Army Corps of Engineers.  We believe that this disclosure is adequate in the context of the instant case.

We hold for petitioners on this issue.

To reflect the foregoing, and respondent's concessions, see supra note 2,

Decision will be entered under Rule 155.